NO. 22-20540

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

D. L. MARKHAM DDS, MSD, INCORPORATED 401(K) PLAN; D.L.
MARKHAM DDS, MSD, INCORPORATED, AS PLAN ADMINISTRATOR,

*Plaintiffs-Appellants*

v.

VARIABLE ANNUITY LIFE INSURANCE COMPANY; VALIC FINANCIAL
ADVISORS, INCORPORATED,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
Case No. 4:22-cv-00974

---

## BRIEF FOR APPELLANTS

---

Chris Baker
Robert Dolinko
Baker Curtis & Schwartz, PC
1 California Street, Suite 1250
San Francisco, CA 94111
(415) 433-1064

John S. Edwards, Jr.
Ajamie LLP
711 Louisiana Street, Suite 2150
Houston TX 77002
(713) 860-1600

David F. Crutcher
Law Office of David F. Crutcher
790 Mission Street
San Rafael, CA 94901
(415) 254-3143

**Attorneys for Appellants
D.L. Markham, DDS, MSD, Inc.
401(k) Plan and D.L. Markham,
DDS, MSD, Inc., as plan
administrator**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**A.**     **Parties**

Plaintiffs-Appellants:    D.L. Markham, DDS, MSD, Inc. 401(k) Plan and D.L. Markham, DDS, MSD, Inc., as plan administrator

Defendants-Appellees:   The Variable Annuity Life Insurance Company and VALIC Financial Advisors, Incorporated

**B.**     **Counsel**

For Appellants:         Chris Baker
Robert A. Dolinko
Baker Curtis & Schwartz, PC
1 California Street, Suite 1250
San Francisco, CA 94111
(415) 433-1064

David F. Crutcher
Law Office of David F. Crutcher
790 Mission Street
San Rafael, CA 94901
(415) 254-3143

John S. Edwards, Jr.
Ajamie LLP
711 Louisiana Street, Suite 2150
Houston TX 77002
(713) 860-1600

For Appellees:    David T. McDowell, Esq.
MCDOWELL HETHERINGTON LLP
1001 Fannin, Suite 2400
Houston, TX 77002
(713) 337-5580

Charan M. Higbee, Esq.
MCDOWELL HETHERINGTON LLP
1999 Harrison Street, Suite 2050
Oakland, CA 94612
(510) 628-2145

_____/S/ Chris Baker_____

Attorney of record for Attorneys for Appellants
D.L. Markham, DDS, MSD, Inc. 401(k) Plan
and D.L. Markham, DDS, MSD, Inc., as plan administrator

## **STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to 5th Cir. R. 28.2.3, Plaintiffs-Appellants respectfully request that this matter be set for oral argument.  This case raises complicated issues under the Employee Retirement Income Security Act of 1974 ("ERISA"), including, (a) whether the imposition of a discretionary fee renders a service provider a fiduciary; and (b) the proper interpretation and application of ERISA's "party in interest" definition.  Oral argument would help clarify and explain these issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS........................................................................................ iv

TABLE OF AUTHORITIES .................................................................................. vi

I.     JURISDICTIONAL STATEMENT ................................................................1

II.    STATEMENT OF ISSUES PRESENTED FOR REVIEW .............................1

III.   STATEMENT OF THE CASE.........................................................................2

    A. Facts Relevant to Issues Presented .........................................................2

        1.   Markham Hires VALIC...................................................................2

        2.   Markham Terminates VALIC .........................................................5

    B. Procedural History ..................................................................................7

    C. Ruling Presented for Review .................................................................10

        1.   VALIC's Status as a Fiduciary......................................................11

        2.   VALIC's Status as a Party in Interest When Entering
             into the Annuity Contract..............................................................12

        3.   VALIC's Status as a Party in Interest When It Decided
             to Collect the Surrender Fee.........................................................14

        4.   Leave to Amend .............................................................................15

IV.    SUMMARY OF ARGUMENT .....................................................................15

    A. As to the Fiduciary Breach Count.........................................................17

    B. As to the Prohibited Transaction Count.................................................18

    C. As to the Denial of Leave to Amend .....................................................20

V.     ARGUMENT .................................................................................................21

    A. Standard of Review.................................................................................21

B.  VALIC Acted as a Fiduciary When It Deliberated and
Imposed the Surrender Fee When Transferring Plan Assets
to a New Provider ......................................................................21

C.  VALIC Was a Party in Interest at the Time of Its Initial
Contract with Markham .............................................................29

  1.  The Plain Meaning of "Party in Interest" Encompasses
Persons Providing Services to a Plan Through a Transaction
Furnishing Such Services...........................................................31

  2.  The DOL Regulations and 2021 Amendments to ERISA
Concerning § 1108 Confirm Markham's Plain Meaning
Interpretation of Party in Interest..............................................33

  3.  The District Court Erred in Concluding the Natural Reading
of "Party in Interest" Excludes Persons Unless They Are Already
Providing Services at the Time of the Contested Transaction...................37

  4.  The Court Should Defer to the DOL's Interpretation that
Service Providers Are Parties in Interest at the Time of the
Initial Contracting .....................................................................40

D.  VALIC Was a Party in Interest at the Time It Transferred
the Plan's Assets and Withheld the Surrender Fee .........................41

E.  The District Court Abused Its Discretion in Denying Plaintiffs
Leave to Amend ..........................................................................43

VI.  CONCLUSION...............................................................................46

CERTIFICATE OF SERVICE ..............................................................47

CERTIFICATE OF COMPLIANCE......................................................48

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Federation of Unions, Local 102 Health & Welfare
  Fund v. Equitable Life Assurance Soc'y of the U.S.*,
  841 F.2d 658 (5th Cir. 1988) .................................................... 11, 17, 22, 27, 29

*Bamm, Inc. v. GAF Corp.*,
  651 F.2d 389 (5th Cir. 1981) .................................................. 21, 43, 44

*Bombardier Aero. Emple. Welfare Benefits Plan v. Ferrer,
  Poirot & Wansbrough, P.C.*,
  354 F.3d 348, 352 (5th Cir. 2003) ........................................................9

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ................................................... 13, 30

*Charters v. John Hancock Life Ins. Co.*,
  583 F.Supp.2d 189 (D. Mass 2008)........................................ 11, 25, 28

*Chavez v. Plan Benefits Serv. Inc.*,
  No. AU-17-CA-00659-SS, 2018 WL 6220119
  (W.D. Tex. Sept. 12, 2018).......................................................... 41, 42

*Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*,
  467 U.S. 837, 104 S.Ct. 2778 (1984)...................................................40

*Comerica  Bank for DALRC Retiree Benefit Tr. v. Voluntary
  Emp. Benefits Assocs., Inc.*,
  No. 1:09-cv-1164 (WSD), 2012 WL 12948705
  (N.D. Ga. Jan. 11, 2012) .......................................................... 30, 37, 38

*Danza v. Fid. Mgmt. Trust Co.*,
  533 Fed.App'x 120 (3d Cir. 2013) ............................................. *passim*

*Depot, Inc. v. Caring for Montanans, Inc.*,
  915 F.3d 643 (9th Cir. 2019) .......................................... 10, 21, 24, 25

*Donovan v. Mercer*,
  747 F.2d 304 (5th Cir. 1984) ...............................................................21

*Dorsey v. Portfolio Equities, Inc.*,
  540 F.3d 333 (5th Cir. 2008) ...............................................................21

*Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc.*
  *Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*,
  931 F.Supp.2d 296 (D. Mass. 2013) .....................................................28

*Golden Star, Inc. v. Mass Mut. Life Ins. Co.*,
  22 F.Supp.3d 72 (D. Mass. 2014) ..........................................................28

*Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*,
  689 F.3d 793 (6th Cir. 2012) .................................................................27

*Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
  302 F.3d 18 (2d Cir. 2002) ....................................................................27

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
  751 F.3d 740 (6th Cir. 2014) ....................................... 11, 17, 26, 28, 29

*Lovelace v. Software Spectrum Inc.*,
  78 F.3d 1015 (5th Cir. 1996) ...................................................................4

*Meredith v. Times Ins. Co.*,
  980 F.2d 352 (5th Cir. 1993) .................................................................41

*Mohasco Corp. v. Silver*,
  447 U.S. 807 (1980).................................................................................36

*Moskal v. United States*,
  498 U.S. 103, 111 S.Ct. 461 (1990).......................................................33

*Olson v. E.F. Hutton & Co.*,
  957 F.2d 622 (8th Cir. 1992) .................................................................22

*Pegram v. Herdrich*,
  530 U.S. 211, 120 S.Ct. 2143 (2000).....................................................22

*Peters v. Aetna Inc.*,
  2 F.4th 199 (4th Cir. 2021) ..................................................... 14, 19, 42

*Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*,
  722 F.3d 861 (6th Cir. 2013) .................................................................27

*Ramos v. Banner Health*,
  1 F.4th 769 (10th Cir. 2022) ............................................................. 13, 30, 38, 39

*Ronches v. Dickerson Employee Benefits, Inc.*,
  No. 09-cv-04279, 2009 WL 10669571 (C.D. Cal. Oct. 30, 2009) .......................37

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*,
  786 F.3d 510 (7th Cir. 2015) ................................................... 20, 43, 45

*Santomenno v. Transamerica Life Ins. Co.*,
  883 F.3d 833 (9th Cir. 2018) ........................................................ 24, 25

*Sellers v. Anthem Life Ins. Co.*,
  316 F.Supp.3d 25 (D.D.C. 2018) ........................................................30

*Ynclan v. Dep't of Air Force*,
  943 F.2d 1388 (5th Cir. 1991) ..........................................................43

**STATUTES**

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

29 U.S.C. § 203(e)(1) ....................................................................32

29 U.S.C. § 1001 .........................................................................37

29 U.S.C. § 1002(14) ....................................................................18

29 U.S.C. § 1002(14)(B) ........................................................ 12, 14, 32, 37

29 U.S.C. § 1002(21)(A) .................................................................22

29 U.S.C. §§ 1002(21)(A)(i), (iii) ................................................. 16, 23

29 U.S.C. § 1002(21)(A)(iii) .............................................................22

29 U.S.C. § 1104(a) ................................................................. 1, 16

29 U.S.C. § 1104(a)(1)(D) ...............................................................26

29 U.S.C. § 1106 ................................................................... *passim*

29 U.S.C. § 1106(a) ............................................................. 18, 31, 42

29 U.S.C. § 1106(a)(1)(B) ...................................................................31

29 U.S.C. § 1106(a)(1)(C) ........................................................ 29, 32, 36

29 U.S.C. § 1106(a)(1)(D) ............................................................. 19, 41

29 U.S.C. § 1106(b) ...........................................................................16

29 U.S.C. § 1106(b)(1)........................................................................21

29 U.S.C. § 1108 ......................................................................... *passim*

29 U.S.C. § 1108(b) .................................................................... 29, 31

29 U.S.C. § 1108(b)(2)........................................................................33

29 U.S.C. § 1108(b)(2)(A) ......................................................... 31, 32, 33

29 U.S.C. § 1108(b)(2)(B) ............................................................. 18, 19

29 U.S.C. § 1108(b)(2)(B)(i) ..............................................................35

29 U.S.C. § 1108(b)(2)(B)(ii)(I)(bb)....................................................35

29 U.S.C. § 1108(b)(2)(B)(v)(I) ..........................................................36

29 U.S.C. § 1109(a) ...........................................................................16

29 U.S.C. § 1132(a)(3).............................................................. 1, 15, 16

29 U.S.C. § 1132(e)(1).........................................................................1

Pub.L. 116-260, Div. BB, Title II, § 202(a), Dec. 27, 2020,
    134 Stat. 2894 ................................................................... 13, 34

**RULES**

Federal Rules of Appellate Procedure, Rule 4(a)(1) ................................1

Federal Rules of Civil Procedure, Rule12(b)(6)....................................20

Federal Rules of Civil Procedure, Rule15 ............................................20

Federal Rules of Civil Procedure, Rule 15(a)........................................43

Federal Rules of Civil Procedure, Rule 15(a)(2) ....................................................43

**REGULATIONS**

29 C.F.R. § 2550.408b-2.............................................................. 2, 33, 35

29 C.F.R. § 2550.408b-2(c) ............................................................... 6, 29

29 C.F.R. § 2550.408b-2(c)(1)(i)...................................................... 34, 35

29 C.F.R. § 2550.408b-2(c)(1)(iii)..................................................... 33, 35

29 C.F.R. § 2550.408b-2(c)(1)(iv).............................................................34

29 C.F.R. § 2550.408b-2(c)(1)(v)(A) ............................................... 34, 36

29 C.F.R. § 2550.408b-2(c)(3)........................................................... 15, 32

Reasonable Contract or Arrangement Under Section 408(b)(2)-Fee Disclosure,
  77 Fed.Reg. 5632 (Feb. 3, 2012) ................................................. 30, 34

**OTHER AUTHORITIES**

H.R. Conf. Rep. 93-1280, 1974 U.S.C.C.A.N. 5038,
  1974 WL 11542 (Leg. Hist.)....................................................................31

*Reading Law*, Scalia and Garner (2012), p. 170.......................................36

# I.    JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of Texas had original jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because Plaintiffs brought claims pursuant to ERISA Sections 409(a) and 502(a)(3), 29 U.S.C. § 1104(a) and § 1132(a)(3).  (ROA.14.)

This Court has jurisdiction under 28 U.S.C. § 1291, as this is an appeal from a final judgment entered by the District Court on October 5, 2022, which disposed of all claims by all parties, and therefore constitutes a final appealable order. (ROA.1334.)  On October 11, 2022, Appellants filed their notice of appeal. (ROA.1335.)  This appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(1) because it was filed within 30 days after entry of the final judgment.

# II.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did VALIC act as an ERISA fiduciary when, after deliberation, it imposed a discretionary surrender fee and took 4.5% of the Markham Plan's assets when it transferred those assets to a new service provider?

2.    Was VALIC a party in interest when it entered into the service provider agreement and/or annuity contract with the Plan?

3.    Was VALIC's retention of the surrender fee upon its transfer of plan assets to a new provider a prohibited transaction?

4.     Did the District Court err in refusing Plaintiffs' request for leave to amend their complaint?

## III.     <u>STATEMENT OF THE CASE</u>

### A.     <u>Facts Relevant to Issues Presented</u>

#### 1.     **Markham Hires VALIC**

Luminita Markham and her husband David are dentists with a small dental practice: Plaintiff D.L. Markham, DDS, MSD, Inc. ("Markham").  In 2017, the dental practice established a retirement plan for its employees named after the practice (the "Plan").  (ROA.014.)  The dental practice is the Plan fiduciary. Defendant Variable Life Insurance Company ("VALIC"), a subsidiary of AIG, specializes in retirement plans.  (ROA.014-015.)

Over the course of several months, in early 2018, Defendant VALIC Financial Advisors ("VFA") marketed retirement plan services to Markham. (ROA.15.)  If permitted, Markham can and would allege that, prior to entering into the service provider agreement or annuity contract with VALIC, VALIC provided certain disclosures to Markham as required by 29 C.F.R. § 2550.408b-2.  In these disclosures, VALIC stated that "VALIC and VALIC Retirement Service Company . . . are considered to be covered service providers."  The disclosures further state that VALIC's surrender charges applied to participant withdrawals, not Plan withdrawals.  (ROA.017.)

Sometime in May 2018,[1] VALIC and Markham entered into a service provider agreement ("SPA") whereby VALIC would maintain Markham's Plan and provide investment management services in connection with investment products sold to the Plan. (ROA.557-562.) The SPA has a section devoted to "Service Fees." (ROA.560.) In addition to specific administrative fees, the fee schedule required Markham to pay a "set up fee" of $300 "for a takeover plan," as well as "annual per participant fees," and "document maintenance fees." (ROA.560, 564.) Other pension services, such as pension administration, would be provided by a third party recommended by VALIC.[2] (ROA.561.)

On or around May 18, 2018, Markham and VALIC entered into a Portfolio Director Group Fixed And Variable Deferred Annuity Contract ("annuity contract"). VALIC was the contract's issuer and record-keeper. (ROA.016.)

---

[1] VALIC's version of the service provider agreement was seemingly executed by Markham on May <u>10</u>, 2018, not May 18, though the handwriting is not entirely clear. (ROA.562.) The precise date on which the parties entered into the SPA, and what was signed by whom and when, is the proper subject of discovery.

[2] The Complaint alleged that VALIC Retirement Services Company ("VRSCO") and VALIC Financial Advisors, Inc. ("VFA") also provided services to the Plan, and were thus named as defendants. Based on Defendants' representations that VRSCO and VFA did not perform contracted services to the Plan, Plaintiffs did not oppose the dismissal without prejudice of VRSCO nor the dismissal of Count II as to VFA, and the District Court issued an order so granting the dismissal. (ROA.470.) However, Plaintiff opposed the motion to dismiss VFA as to Count I. (ROA.921, et *seq*.)

3

At its most basic, the annuity contract allows participants to save for retirement by investing money in variable annuities, through "Purchase Payments," the funds for which can be rolled over or directly transferred from another plan. (ROA.515 (§ 1, 2.04).) Purchase Payments are allocated to each participant's account which are held by VALIC for the participants' exclusive benefit, in a "Separate Account A."[3] (ROA.515, 516, 530 (§ 1, 3.02, 6.03).) VALIC states it deducts fees – maintenance or separate account charges – from the participants' accounts in exchange for providing services. (ROA.515 (§§ 2.05, 2.06).)

Under the contract, a participant can get his money back from VALIC through a "Cash Surrender" or a "Withdrawal" (ROA.518 (§§ 4.01-02)), but this may come at a price. "The Cash Surrender or Withdrawal charge is 5% of (1) the amount withdrawn, or (2) the amount of any Purchase Payments received during the most recent 60 months prior to the surrender or withdrawal, whichever is less." (ROA.518 (§ 4.3).) VALIC, of course, knows the terms of the annuity contract that it drafted. (ROA.018.) VALIC maintains that, under this contract, if a Plan changes service providers (as opposed to a participant's early withdrawal of his or her funds for personal use), VALIC can charge all participants in the Plan up to

---

[3] "The Separate Account is registered with the SEC as a Unit Investment Trust." (ROA.904.) "The assets of the Separate Account are segregated from the Company's assets." (ROA.905.) *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1017-1018 (5th Cir. 1996) ("courts may . . . consider matters of which they may take judicial notice" in deciding motions to dismiss).

five percent of their retirement savings. And the more that participants invest in their retirement, the more it can cost them – in pure dollar terms – for the Plan to change providers.

The existence of the surrender charge is prominently identified on the first page of the annuity contract. (ROA.512.) As an ERISA fiduciary, Markham should have known the surrender fee harms the Plan and its participants. But the Markhams are dentists, not a variable annuity life insurance company. Moreover, whether or not to impose the surrender fee is entirely up to VALIC. The annuity contract states: "We may waive any withdrawal or surrender charge attributable to Purchased Payments received during specific periods of time, and under conditions and Limitations set by Us." (ROA.519 (§4.06).)

As a result of its contracts with VALIC, Markham rolled its employees' retirement savings onto VALIC's platform and into the annuity contract. VALIC now held the Plan assets.

### 2.    Markham Terminates VALIC

In or around January 2020, Markham determined that the investment returns and quality of services provided by VALIC were insufficient to justify the high fees imposed by it through the investment funds VALIC made available to Plan participants. (ROA.016.) Markham informed VALIC that it intended to terminate the Plan's contract with VALIC and select a successor Plan service provider. Over

the next eight months, VALIC resisted Markham's efforts to terminate the relationship, continuing to collect fees all the while.  (ROA.016-017.)

On April 30, 2020, VALIC informed Markham that the annuity contract "provided for a 5% surrender charge on transfers out of the contract on amounts contributed in the previous 60 months which would effectively cover all assets to be transferred by the Plan." (ROA.016.)  In other words, VALIC asserted it could take 5% of each participant's retirement savings if Markham transferred the Plan's assets to a different provider.  (ROA.016.)  VALIC also informed Markham that the contract contained exceptions to the imposition of the surrender charge, including VALIC's right to waive the charge, as referenced above. (ROA.016-017.)  Markham retained counsel.  (ROA.017.)

Markham's counsel sent VALIC a letter and explained the prohibition on termination penalties in 29 C.F.R. § 2550.408b-2(c).  (ROA.017.)  VALIC responded that its Executive Review Committee ("Committee") would review the matter.  (ROA.017).  According to VALIC, this Committee consisted of five senior executives and two attorneys.  (ROA.086.)  VALIC also said the decision to impose the surrender fee was made by Eric Levy, VALIC's Executive Vice President, "after consulting the appropriate persons."  (ROA.087.)  The consultation period lasted six weeks.  (ROA.017.)

If permitted to amend the complaint, Plaintiffs can and would allege that VALIC refused to transfer the Plan's assets to the new service provider unless Markham first entered into a "transition agreement" with VALIC. The transition agreement required Markham to release certain claims against VALIC as a condition of VALIC releasing the Plan's assets. In order to end the Plan's disadvantageous relationship with VALIC, and transfer the assets to a new service provider, the Plan had no choice but to sign the transition agreement. Pursuant to this agreement, on or about August 19, 2020, VALIC transferred the Plan's assets to the successor's platform, minus a surrender fee of $20,703, representing approximately 4.5% of the Plan's assets. (ROA.017-018.)

## B.   **Procedural History**

The Complaint was filed on January 4, 2021, in the Eastern District of California, where Plaintiffs have their dental practice. (ROA.013.) On March 1, 2021, Defendants filed motions to dismiss and a motion to transfer venue to the Southern District of Texas. (ROA.082, 110, 127.) On April 1, 2021, Plaintiffs opposed the motions. (ROA.006, 212, 266, 315.) In doing so, Plaintiffs asked for leave to amend if the motions to dismiss were granted. For example, in its opposition to VALIC's motion, it argued that "if the Court concludes VALIC was not a party in interest at the relevant time, it can construe (or Plaintiffs can amend) Count I to be based on VALIC's knowing participation in a fiduciary breach."

(ROA.283.)  Plaintiffs also stated that, if necessary, they could add further allegations in support of their request for equitable relief.  (ROA.286.)  In their opposition to VALIC Financial Advisors' motion, Plaintiffs also requested leave to amend if the motion was granted in any respect.  (ROA.316.)

On April 2, 2021, the Eastern District took the VALIC Defendants' motions under submission.  (ROA.007.)  It later entered an order staying discovery pending its ruling on Defendants' motions.  (ROA.411-413.)  On March 25, 2022 – about a year after Defendants' motions were submitted – the Eastern District granted the motion to transfer venue, citing, among other things, the district's long-time judicial emergency status.  (ROA.435, 437.)  In the same order, the Eastern District denied the motions to dismiss as moot.  (ROA.437.)

The case was transferred to the Southern District of Texas.  The parties then agreed, and the District Court ordered, a briefing schedule for Defendants' renewed and revised motions to dismiss.  Defendants' motions were due in April 2022, Plaintiffs' oppositions were due in May 2022, and Defendants' replies were due in June 2022.  (ROA.448.)

In Defendants' motions to dismiss, they argued leave to amend should be denied because amendment would be futile.  (ROA.505.)  Plaintiffs disagreed, and asked for leave to amend in the event the motions were successful in any way.

(ROA.734.)[4]  Plaintiffs stated:

> In the event the Court grants any part of VALIC's motion
> to dismiss, Plaintiffs seek leave to amend. For example,
> if the Court doubts VALIC is a party in interest, Plaintiffs
> can allege VALIC conceded this fact in its disclosures by
> describing itself as a "covered service provider" – and
> thus a party in interest – within the meaning of ERISA
> prior to entering into any relationship with Plaintiffs.  If it
> concludes VALIC is not a party in interest, Plaintiffs can
> amend the complaint (to the extent necessary) to allege
> claims against VALIC based on VALIC's knowing
> participation in Plaintiffs' fiduciary breach – irrespective
> of VALIC's party in interest status. *Bombardier, supra,*
> 354 F.3d at 352. If the PD contract falls outside of
> ERISA's scope (because VALIC was not a service
> provider at the time), Plaintiffs can potentially amend to
> allege state law claims such as fraud in the inducement
> based on VALIC's misleading disclosures. Plaintiffs
> could also potentially add allegations about VALIC's
> decision to hold the Plan's assets ransom unless Plaintiffs
> signed its transition agreement, allegations about the fees
> paid under the SPA, allegations about the manner in
> which VALIC exercised discretion in imposing the
> surrender charge, or allegations about Plaintiffs' ability
> to trace the Plan's assets.
>
> While Plaintiffs cannot know how they might amend
> their complaint until they know the manner in which it
> might be deficient, Plaintiffs can foresee numerous ways
> in which any deficiencies could be addressed.

(ROA.734.)

---

[4] Plaintiffs also asked for leave to amend in their opposition to VALIC Financial
Advisors' renewed motion to dismiss.  (ROA.926, 929, 933.)

In reply, VALIC made the new argument that granting leave to amend would be prejudicial due to Plaintiffs' "unexplained delay in asserting new allegations known to them before filing the case." (ROA.1145.) Because the District Court did not hear oral argument, Plaintiffs did not have the opportunity to respond to VALIC's new "unexplained delay" argument.

On July 15, 2022, the parties submitted a joint discovery/case management plan to the District Court. (ROA.1293-1302.) Plaintiffs sought to begin discovery and Defendants requested that the Eastern District's discovery stay remain in place. (ROA.1296-98.) On July 18, 2022, the District Court continued the discovery stay. (ROA.1303.)

On October 5, 2022, the District Court issued an opinion and order dismissing the complaint and entered judgment without ever affording Plaintiffs an opportunity to amend. (ROA 1304-1333, 1334.) This appeal followed. (ROA.1335.)

**C.      Ruling Presented for Review**

The District Court granted VALIC's motion to dismiss as to all defendants, and thus denied VFA's motion as moot. (ROA.1304-1333.)

### 1.  VALIC's Status as a Fiduciary

The District Court first addressed whether VALIC acted as a plan fiduciary when imposing the surrender fee.  It considered essentially three lines of cases.

The first line of cases stands for the general proposition that a service provider does not act as a fiduciary when it merely accepts previously bargained-for fixed compensation.  *E.g., Depot, Inc. v. Caring for Montanans, Inc.,* 915 F.3d 643, 655 (9th Cir. 2019).  This is because, at the time the fee is collected, the provider has "no actual control or discretion over the transaction at issue – the price of the previously bargained-for fees."  *E.g., Danza v. Fid. Mgmt. Trust Co.,* 533 Fed.App'x 120, 126 (3d Cir. 2013).  (ROA.1315.)

The second line of cases holds that collecting fees is a fiduciary act if the amount of the fee depends on factors within the provider's control.  *E.g., Am. Federation of Unions, Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658, 662-663 (5th Cir. 1988).  (ROA.1316-1317.)  The District Court concluded this exception was limited to situations where there was both: (1) the exercise of discretion over a variable in the formula used for fixing the fee; and (2) no maximum fee.  (ROA.1318-1319.)   In the District

Court's view, VALIC's surrender fee was not analogous to these cases. (ROA.1317, 1318-1319.)

The third line of cases is similar to the second. These cases hold that the authority to exercise discretion to retain funds as compensation, set a fee in a bounded range, or the exercise of discretion in waiving fees entirely, renders the provider a fiduciary with respect to those fees. *E.g., Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 744 (6th Cir. 2014); *Charters v. John Hancock Life Ins. Co.*, 583 F.Supp.2d 189, 197 (D. Mass 2008). (ROA.1317-18). The District Court did not find these cases persuasive. (ROA.1318.)

It reasoned there was no practical difference between a discretionary fee within a specified range and a fixed fee. "Each contract allows the provider to collect up to a maximum fee or percentage, and the provider can always agree to accept less compensation or waive the fee entirely." (ROA.1318.)

Thus, the District Court held VALIC was not a fiduciary when it decided to collect what it considered to be a predetermined surrender fee. (ROA.1319.) Accordingly, it concluded Markham did not state a claim for breach of fiduciary duty.

**2.    VALIC's Status as a Party in Interest When Entering into the Annuity Contract**

Next, the District Court considered whether VALIC was a party in interest when it initially contracted with the Plan. Here, the District Court focused almost

exclusively on the definition of "party in interest" in 29 U.S.C. § 1002(14)(B), *i.e.*, "a person providing services to such plan."

The District Court reasoned the words "a person providing" potentially had four meanings: (1) someone who has started provided something; (2) someone who will soon be providing something; (3) someone who wants to provide something; or (4) someone in the business of providing something. (ROA.1320-1321.) Of these four, the District Court concluded the first option was the most natural reading because the entire phase – "a person providing services <u>to such plan</u>" – limited the definition to those who had either agreed to, or had started to, provide services to the plan. (ROA.1321.) The District Court noted that the definition of parties in interest includes employers and unions whose employees/members are "covered by such plan." (ROA.1321.) It reasoned the party-in-interest definition, overall, was focused on insiders, and a provider with no pre-existing relationship was not an insider. (ROA.1322.)

The District Court rejected the Department of Labor's (DOL's) contrary view: that all service contracts with providers – whether new, renewed or extended – are prohibited party in interest transactions unless they meet an § 1108 exemption. The District Court was not persuaded by the DOL regulations implementing this interpretation by requiring all service providers seeking to do business with pension plans meet certain disclosure requirements in order to satisfy

the exemption.  Nor was the District Court persuaded by Congress's 2021 amendments to 29 U.S.C. § 1108, which extended these disclosure requirements to group health plans.  (ROA.1324-25.)  Instead, the District Court appeared to read Congress's 2021 amendments as broadening the party-in-interest definition to include group health plan providers that did not comply with the mandated disclosure requirements, but nothing more.  (ROA.1325, 1327.)

The District Court noted the circuits' and lower courts' disagreement on this issue, *cf. Ramos v. Banner Health*, 1 F.4th 769, 787 (10th Cir. 2022), *with Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009), and found those courts excluding new providers from the party-in-interest definition persuasive. (ROA.1325-1327.)   It did not give the DOL's interpretation *Chevron* deference because it found 29 U.S.C. § 1002(14)(B) unambiguous.

It thus concluded that, because VALIC was not a party in interest at the time it entered into the annuity contract with Plaintiffs, the contract was not a prohibited transaction.  (ROA.1327.)

### 3.    VALIC's Status as a Party in Interest When It Decided to Collect the Surrender Fee

Third, the District Court considered whether VALIC was a party in interest when it withdrew the surrender fee from the Plan's assets as it transferred the Plan to the new service provider.  The District Court relied on its earlier conclusion, that VALIC was not a fiduciary when it collected the surrender fee, to also conclude

this was not a prohibited transaction. (ROA.1330.) In both situations, the District Court reasoned, the sole transaction within the meaning of § 1106 was the entry into the annuity contract. The District Court distinguished the Fourth Circuit's decision in *Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021), by explaining that, while a fee could constitute a separate transaction if the fee was not provided for or authorized by the contract, that was not the case here. (ROA.1330.)

Based on its conclusion that there was no prohibited transaction within the meaning of § 1106, the District Court dismissed Markham's claim for equitable relief under § 1132(a)(3).

### 4.    Leave to Amend

Finally, the District Court denied Plaintiffs' request for leave to amend their complaint. It stated Plaintiffs provided no justification for their delay in failing to amend the complaint and that their additional allegations were "general and equivocal." (ROA.1331.) Thus, the District Court concluded it would not be an efficient use of the District Court's or the parties' resources for the District Court to grant leave to amend. (ROA.1332.)

## IV.    SUMMARY OF ARGUMENT

At bottom, this is an ERISA case about a termination penalty. Markham wanted to help its employees save for retirement. It formed an ERISA pension plan and, as is typical, hired a service provider to help administer the plan and

manage its assets.  Markham and its Plan later decided to change service providers because VALIC's fees were too high and its services too poor.  In response, VALIC exercised its discretionary authority and took 4.5% of all the Plan's assets (meaning 4.5% of all its participants' retirement savings) as a condition of transferring the remaining assets to a new provider.  ERISA prohibits termination penalties like VALIC's surrender fee.  29 C.F.R. § 2550.408b-2(c)(3).  The fee was not typical.  It was unlawful.

Plaintiffs assert two ERISA claims on behalf of themselves and a class.  The first count seeks equitable relief under 29 U.S.C. § 1132(a)(3).  It alleges that VALIC was a knowing participant in a prohibited transaction both when it entered into the contract containing the discretionary surrender fee and when it imposed the fee as a condition of transferring the Plan's assets.  The second count seeks remedies under 29 U.S.C. § 1109(a).  It alleges VALIC breached its fiduciary duties when it took, for itself, 4.5% of the Plan's assets.  VALIC had an obligation to discharge its duties solely in the interests of the Plan's participants and beneficiaries.  29 U.S.C. § 1104(a).  Instead, VALIC engaged in unlawful self-dealing under 29 U.S.C. § 1106(b).

The District Court dismissed Plaintiffs' complaint without granting leave to amend.  It ruled, as a matter of law, that VALIC was not a fiduciary and there was

no prohibited transaction.  Plaintiffs ask this Court to reverse the District Court's judgment and remand the case for further proceedings.

## A.    <u>As to the Fiduciary Breach Count</u>

There are three ways VALIC can be a functional fiduciary under ERISA with respect to the imposition of the surrender fee.  It can exercise discretionary authority over the fee, exercise any authority or control over the management or disposition of the plan's assets (from which the fee is taken), or have discretionary authority over the fee.  29 U.S.C. §§ 1002(21)(A)(i), (iii).  VALIC meets, not just one, but all three of these definitions.  The annuity contract gave VALIC unlimited discretion over the fee, it exercised this discretion when it deliberated and declined to waive the fee, and it exercised authority and control over disposition of the plan's assets by deducting the fee upon the transfer of assets to the new provider.  Thus, it was a plan fiduciary.

The case law supports this conclusion.  For example, in *Danza* and its progeny, the fee was pre-determined and fixed by contract such that the provider neither exercised nor possessed any discretionary authority over it.  *Id., supra,* 533 Fed.App'x at 124.  In *Equitable Life*, on the other hand, the provider was delegated discretionary authority over a fee variable, *id., supra,* 841 F.2d at 663, and in *Hi-Lex*, the provider exercised discretion (even if it was not delegated) by unilaterally waiving the fee for some clients and not others, *id., supra,* 751 F.3d at 744-45.

17

This case is like *Equitable Life* and *Hi-Lex*.  Because VALIC had unilateral and unfettered discretion over the surrender fee, and because the surrender fee came from plan assets, VALIC was an ERISA fiduciary when deciding to impose the fee and take it from plan assets.  Because VALIC favored itself over plan participants in imposing the discretionary fee, it breached its fiduciary duties.  Thus, the District Court erred in dismissing Count II of the complaint for fiduciary breach.

**B.**     **As to the Prohibited Transaction Count**

VALIC was a "party in interest" both at the time it entered into the annuity contract with the Plan and at the time it imposed the surrender fee.  Thus, these were prohibited transactions under 29 U.S.C. § 1106(a) unless they were exempted by 29 U.S.C. § 1108(b)(2)(B).  The transactions were not exempt because the surrender fee is an unlawful termination penalty and thus unreasonable.

The best interpretation of the statutory text is that a provider is a party in interest under 29 U.S.C. § 1106(a) for purposes of its initial transaction with a plan, as well as any extended or renewed transactions.  This reading is the only way to make sense of 29 U.S.C. § 1108, which includes as a party in interest, a person who provides services for the "establishment of a plan."  Because a person cannot provide services to a plan before the plan exists, a party in interest must include persons who agreed to perform services as a part of the initial transaction.

The definition of "party in interest" in 29 U.S.C. § 1002(14), when read in conjunction with 29 U.S.C. §§ 1106 and 1108, supports this meaning. A transaction to furnish services between a plan and "a person providing services to such plan" is a common way to describe *any* transaction between a plan and a provider, not just subsequent transactions. And, while Congress was concerned about a fiduciary favoring insiders when prohibiting specified transactions absent an exemption, it also was concerned with plans being locked into long term disadvantageous contracts. Such contracts are a risk with initial contracts as well as with extended or renewed contracts.

This interpretation of "party in interest" is also the interpretation established by the DOL and confirmed by the 2021 amendments to 29 U.S.C. § 1108(b)(2)(B). To the extent there is any ambiguity, the Court should defer to the DOL's interpretation.

Even if VALIC was not a party in interest when it entered into the annuity contract, it surely was one when it imposed the surrender fee. The imposition of this charge resulted in the transfer to VALIC, or use for VALIC's benefit, of plan assets. 29 U.S.C. § 1106(a)(1)(D). Namely, 4.5% of the Plan participants' retirement savings. This was a separate and independent transaction requiring separate decision-making and (as Plaintiffs can allege) a separate agreement. The fee was not automatic, but rather arose from Plaintiffs' decision to change service

providers and VALIC's decision to impose the fee. VALIC's knowledge that the fee potentially was unlawful at the time it was imposed further supports its treatment as a separate prohibited transaction. *See, Peters, supra,* 2 F.4th at 240.

The District Court thus erred in dismissing Count I, Plaintiffs' cause of action for equitable relief arising from the prohibited transactions.

## C.    <u>As to the Denial of Leave to Amend</u>

Under F.R.C.P. 15, leave to amend a complaint is given freely. "A plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try and amend her complaint before the entire action is dismissed." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015).

Here, the District Court should have granted leave to amend. Plaintiffs engaged in no undue delay, and there is no evidence of bad faith, dilatory motive, or prejudice to Defendants. Defendants' motions to dismiss were under submission for 16 of the 22 months the case was pending in the District Courts. Plaintiffs cannot reasonably be blamed for this passage of time. The District Court denied leave to amend even though there had been no discovery and there was no trial date. In any event, given the unsettled state of the law, it was and remains far from obvious that Plaintiffs' complaint was deficient in any respect. Nevertheless, Plaintiffs set forth additional allegations and legal theories to support their request

for leave. There was no suggestion by the District Court that an amendment would be futile, and the refusal to grant leave to amend caused Plaintiffs undue prejudice. The District Court improperly denied them the opportunity to have their case heard on its merits. The District Court abused its discretion in denying Plaintiffs leave to amend.

## V.    ARGUMENT

### A.    Standard of Review

The Court reviews the District Court's decision to grant VALIC's motion to dismiss *de novo*, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008). The Court reviews the decision to deny leave to amend for an abuse of discretion. *E.g., Bamm, Inc. v. GAF Corp.*, 651 F.2d 389, 391 (5th Cir. 1981).

### B.    VALIC Acted as a Fiduciary When It Deliberated and Imposed the Surrender Fee When Transferring Plan Assets to a New Provider

ERISA prohibits plan fiduciaries from dealing with the assets of a plan in their own interest or for their own account. 29 U.S.C. § 1106(b)(1). They cannot self-deal. Courts broadly construe the term "fiduciary." *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir. 1984). A person is a fiduciary with respect to a plan to the extent "(i) he exercises any discretionary authority or control respecting management of such plan [clause 1] or exercises any authority or control

respecting management or disposition of its assets [clause 2][5] . . . **or** (iii) he **has**

any discretionary authority or discretionary responsibility in the administration of

the plan."[6]  29 U.S.C. § 1002(21)(A).  If a plan delegates discretionary authority to

a person, that makes the person a fiduciary.  *Equitable Life, supra,* 841 F.2d at 663.

This is so even if the authority is not exercised.  "There is a clear difference

between the language contained in subsections one and three [clauses i and iii of

29 U.S.C. § 1002(21)(A)].  Subsection one [clause i] imposes fiduciary status on

those who exercise discretionary authority, regardless of whether such authority

was ever granted.  Subsection three [clause iii] describes those individuals who

have actually been granted discretionary authority, regardless of whether such

authority is exercised."  *Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 625 (8th Cir.

1992).  The threshold question is "whether [the party] was acting as a fiduciary []

when taking the action subject to complaint."  *Pegram v. Herdrich*, 530 U.S. 211,

226, 120 S.Ct. 2143, 2153 (2000).

The action subject to Plaintiffs' fiduciary breach claim was VALIC's

imposition of the surrender fee upon the transfer of funds to a new service

---

[5] These provisions are distinct and must be analyzed separately.  *Depot, supra,* 915
F.3d at 654.

[6] The District Court misread 29 U.S.C. § 1002(21)(A)(iii) to also require the
*exercise* of discretion.  (ROA.1316.)  Under § 1002(21)(A)(iii), a person is a
fiduciary if he **has** any discretionary authority or responsibility, without regard to
its exercise.

provider.  In the annuity contract, the Plan delegated to VALIC unlimited discretionary authority over this fee.  VALIC could impose it, partially impose it, or not impose it all.  Here, VALIC chose to impose a surrender fee of 4.5% and take more than $20,000 from the Plan's assets.[7]  It dealt with the Plan's assets in its own interest and its own account.  This was a straightforward breach of fiduciary duty.

This conclusion is compelled by the statute.  ERISA defines a fiduciary as someone who exercises discretionary authority, exercises authority or control, or has discretionary authority.  29 U.S.C. §§ 1002(21)(i), (iii).  VALIC's conduct in imposing the fee meets all of these definitions.  Whether the Plan should pay a vendor's bill – in this case VALIC's fee – is an act of plan administration.  VALIC had discretionary authority over this decision because the contract delegated this authority to it.  VALIC exercised discretion by deliberating and then declining to waive the fee.  And VALIC exercised authority and control over Plan assets by taking the fee when it transferred the assets.  Thus, when it imposed the fee, VALIC was a fiduciary.

---

[7] It is unknown why VALIC exercised its discretion to impose a fee of 4.5% instead of the 5% ceiling.  VALIC alleged in the briefing below that it only assessed a surrender fee on 90% of the assets because 10% of the "Accumulated Value" could be withdrawn with no penalty.  But the provision of the annuity contract referenced by VALIC applies only to *participant* withdrawals, not *plan* withdrawals. (See ROA.518 (§ 4.03(b)).)

23

This conclusion also is compelled by the case law.  In *Danza*, a plan participant claimed the provider breached its fiduciary duty by charging an excessive fee for the review of domestic relations orders.  *Id., supra,* 533 Fed.App'x at 122.  The Third Circuit disagreed, explaining the provider was not a fiduciary when it charged the fee because the fee "was set in the agreement with [the plan], and [the provider] did not have the unilateral discretion to change it." *Id.* at 124.

Similarly, in *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833 (9th Cir. 2018), the Ninth Circuit decided "the narrow [] question . . . whether [defendant] was acting as a fiduciary when withdrawing precise, preset fees from the pooled accounts." *Id.* at 840.  It explained: "Our holding today is narrow.  We simply conclude that when a service provider's definitively calculable and nondiscretionary compensation is clearly set forth in a contract with the fiduciary-employer, collection of fees out of plan funds in strict adherence to that contractual term is not a breach of the provider's fiduciary duty." *Id.* at 841.

*Depot* is like *Santomenno*.  It concerned only subdivision (i) of ERISA's fiduciary definition, not subdivision (iii), and held that charging an agreed-upon (if inflated) insurance premium was not a discretionary act.  *Depot, supra,* 915 F.3d at 654 n.5.

24

Each of these cases turns on the complete lack of discretion when taking the action subject to the complaint, *i.e.*, accepting previously bargained-for, and agreed-upon, fixed compensation. None addressed a service provider that, under the governing documents, had the delegated discretionary authority to waive or reduce its own surrender fee.

Nonetheless, the District Court believed "that the logic of *Depot* and *Santomenno* applies here." (ROA.1316.) "There is no practical difference between a contract that permits a provider to set a fee within a contractually bounded range, as in <u>Charters</u>; a contract that sets a fixed fee but specifies that the fee is waivable, as in this case; and a contract that sets a fixed fee. Each contract allows the provider to collect up to a maximum fee or percentage, and the provider can always agree to accept less compensation or waive the fee entirely." (ROA.1318.)

There are several errors with this reasoning. The first is the assumption that a service provider *always* has the *unilateral* right to waive its fee, regardless of what the contract says. Not exactly. A unilateral waiver is an exercise of discretion that, depending on the circumstances, implicates fiduciary obligations. In *Danza*, for example, the court ruled that the provider was not a fiduciary because the fee structure "was set in the agreement with [the plan] and [the provider] did <u>not</u> have unilateral discretion to change it." *Danza, supra,* 533

Fed.App'x at 124.

In most situations, of course, a plan will agree to a provider's proposed waiver because it will benefit the participants. However, in those situations, the waiver is not actually unilateral. It is mutual. One can certainly imagine situations where a unilateral waiver – outside the terms of the contract – would cause mischief. A provider might use a waiver (*i.e.*, a refusal to accept payment) to set up the repudiation of a contract it no longer wants to perform. It might unilaterally waive its fees for the person charged with negotiating the renewal of its service contract, whether as a bribe or to create a sense of obligation. Or, as in *Hi-Lex, supra,* 751 F.3d at 744-45, the provider might unilaterally waive fees for some clients and not others, perhaps to avoid the scrutiny of sophisticated clients so that it can continue its questionable fee practices against the less sophisticated or inattentive clients.

In other words, there *is* a practical difference between the collection of a contractually required, pre-determined fee and a fee over which the provider has express delegated discretionary authority. A fiduciary must "discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Here, the instrument is the annuity contract, and the contract delegates to VALIC the discretion to impose, reduce or waive the

26

surrender fee.  Given the language of the annuity contract, VALIC was obliged, and the plan and participants had legitimate reason to believe, that VALIC would exercise its discretion in a manner that placed the interests of the participants over the interests of VALIC.

From this perspective, there is no practical difference between a fee where the provider has the delegated discretion to change a variable used in calculating the fee, as in *Equitable Life*, and a fee where the provider has the delegated discretion to change the fee directly, as in this case.  *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 29 (2d Cir. 2002) ("When a contract, however, grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary.").

This is why all cases involving delegated discretion to set a fee, including this Court's decision in *Equitable Life,* have concluded the person with the discretion is a fiduciary.  *E.g., Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.,* 722 F.3d 861, 867 (6th Cir. 2013) ("Because an entity that exercises *any* authority or control over disposition of a plan's assets becomes a fiduciary, the district court was correct to conclude that Defendant was an ERISA fiduciary with respect to Defendant's collection of the … fee from Plaintiff," *citing Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.,* 689 F.3d 793, 798 (6th Cir. 2012);

*Golden Star, Inc. v. Mass Mut. Life Ins. Co.,* 22 F.Supp.3d 72, 81 (D. Mass. 2014) ("MassMutual had the discretion to unilaterally set fees up to a maximum and exercised that discretion."); *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*, 931 F.Supp.2d 296 (D. Mass. 2013) (bank that offered and managed funds was a fiduciary with regard to its compensation because its contract with the ERISA plan allowed it to charge a lending fee anywhere from 0% to 50%); *Charters v. Hancock Life Ins. Co.,* 583 F.Supp.2d 189, 197 (D. Mass. 2008) (insurer had fiduciary discretion because, similar to this case, it could set its fee up to a maximum negotiated level).

Indeed, the Sixth Circuit in *Hi-Lex* applied this reasoning even when there was no express delegation of discretion. In that case, Blue Cross asserted it did not act as a fiduciary when it charged certain fees because the fees were part of a standard pricing arrangement across its business line, *i.e.*, they were nondiscretionary. *Hi-Lex, supra,* 751 F.3d at 744. Yet Blue Cross imposed those fees on some clients but not others, evidencing its exercise of discretion notwithstanding the pricing arrangement. This rendered Blue Cross a fiduciary with respect to the imposition of those fees across the board. *Id.* at 744-45. In this

28

case, of course, there is more than just the exercise of discretion. There is also the delegated authority to exercise discretion.[8]

In seeking the dismissal of Markham's fiduciary breach claim, VALIC asks this Court to distort the statutory language, reject the logic of *Equitable Life*, reject *Hi-Lex,* and create a split with the Sixth Circuit. The Court should decline to do so, and instead conclude that Plaintiffs have stated a claim that VALIC breached its fiduciary duties in imposing the surrender fee when transferring the Plan's assets to a new provider.

## C.     **VALIC Was a Party in Interest at the Time of Its Initial Contract with Markham**

The Complaint alleges that VALIC was a knowing participant in a prohibited transaction within the meaning of 29 U.S.C. § 1106(a)(1)(C) when it contracted with Markham to provide investment management services through an annuity contract that included the 5% surrender fee. The Complaint also alleges this transaction was not exempt within the meaning of 29 U.S.C. § 1108(b) because the fee was an unreasonable termination penalty. 29 C.F.R. § 2550.408b-2(c). The District Court ruled that, because VALIC was not providing services to the Plan before it entered the contract, VALIC was not a party in interest at the

---

[8] *Hi Lex* does not quote the language of the pricing arrangement. It is possible that the precise language granted Blue Cross discretionary authority to waive or reduce the fee. If so, *Hi Lex* is precisely on point.

time it entered the contract. Thus, no prohibited transaction occurred – even if the fee *was* an unreasonable penalty. (ROA.1327.)

Along with the District Court, the Tenth Circuit and the Third Circuit (in an unpublished opinion) have concluded that a service provider is not a party in interest unless it is providing services to a plan before it enters into the contested contract. *Ramos v. Banner Health*, 1 F.4th 769 (10th Cir. 2021); *Danza, supra,* 533 Fed.App'x at 125. The Eighth Circuit and the Department of Labor (DOL) have concluded that all services providers – new and existing – are parties in interest. Thus, both initial and subsequent transactions between plans and service providers must meet the exemption requirements of 29 U.S.C. § 1108. *Braden v. Wal-Mart Stores, Inc.* 588 F.3d 585 (8th Cir. 2009); Reasonable Contract or Arrangement Under Section 408(b)(2)-Fee Disclosure, 77 Fed.Reg. 5632 (Feb. 3, 2012) (amending 29 CFR Part 2550). The district courts are divided. *Cf., e.g., Sellers v. Anthem Life Ins. Co.*, 316 F.Supp.3d 25 (D.D.C. 2018) (existing relationship required) *with Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp. Benefits Assocs., Inc.*, No. 1:09-cv-1164 (WSD), 2012 WL 12948705, at *18 & n.27 (N.D. Ga. Jan. 11, 2012)(no pre-existing relationship required).

The better argument is that service providers are parties in interest at the time of the initial contract to furnish services, as well as after.

1.  **The Plain Meaning of "Party in Interest" Encompasses
    Persons Providing Services to a Plan Through a Transaction
    Furnishing Such Services**

Section 1106(a) of ERISA states that "[e]xcept as provided in section 1108,"

six types of transactions between a fiduciary and a party in interest are prohibited.

Section 1108, in turn, states that "the prohibitions provided in section 1106 shall

not apply" to these transactions under certain conditions.  29 U.S.C. § 1108(b).

Given this cross-referencing, sections 1106(a) and 1108 must be read together.

And while § 1106(a)(1)(B) <u>prohibits</u> a fiduciary from knowingly causing a

transaction that constitutes a furnishing of services between the plan and a party of

interest, § 1108(b)(2)(A) <u>exempts</u> "contracting or making <u>reasonable</u> arrangements

with a party in interest for office space or legal, accounting, or other services

necessary for <u>the establishment of the plan</u> or operation of the plan, if no more than

<u>reasonable</u> compensation is paid therefor."  Congress expected that arrangements

which satisfied the exemption will "allow the plan to terminate services, etc., on

reasonably short notice under the circumstances so the plan does not become

locked into an arrangement that may become disadvantageous.  It is also expected

that the compensation arrangements will allow for changes so the plan will not be

locked into a disadvantageous price."  H.R. Conf. Rep. 93-1280, 1974

U.S.C.C.A.N. 5038, 1974 WL 11542 (Leg. Hist.).  The DOL thus concluded that a

contract for services is not reasonable unless it permits the plan to terminate the

contract without penalty on reasonably short notice.  29 C.F.R. § 2550.408b-2(c)(3).  VALIC's surrender fee fails this test.

ERISA defines "a person providing services to such plan" as a real party in interest.  29 U.S.C. § 1002(14)(B).  Inserting this definition into the prohibited transaction section, ERISA provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect furnishing of services between the plan and [a person providing services to such plan.]" 29 U.S.C. § 1106(a)(1)(C) (cleaned up).  Like defining the term "employee" to "mean any individual employed by an employer," 29 U.S.C. § 203(e)(1), this phrasing, while a bit tautological, is clearly intended to describe the relationship of the parties within the transaction to one another.  It does not reference what one person might otherwise already be doing at the time the transaction is constituted.

This reading is confirmed by § 1108, the counterpart to § 1106.  If a particular transaction was *not* prohibited, a § 1108 exemption would be unnecessary.  Yet § 1108 exempts from § 1106 contracts or reasonable arrangements with a party in interest [person providing services to such plan] for services necessary for the establishment of the plan.  29 U.S.C. § 1108(b)(2)(A).  This language makes sense only if a party in interest includes the person providing services as part of the transaction itself.  The contrary interpretation – that the

person *already* must be providing services to the plan – makes § 1108(b)(2)(A) unintelligible.  No one can provide services to a plan before the plan exists.  If a provider who has yet to provide services to a plan cannot engage in a prohibited transaction with such plan, then the exemption permitting reasonable transactions with a party in interest to *establish* a plan is nugatory.   "A court should give effect, if possible, to every clause and word of a statute." *Moskal v. United States,* 498 U.S. 103, 104, 111 S.Ct. 461, 462 (1990) (internal quotes omitted).

**2.    The DOL Regulations and 2021Amendments to ERISA Concerning § 1108 Confirm Markham's Plain Meaning Interpretation of Party in Interest**

The DOL considers initial contracts with service providers to be prohibited transactions unless they meet the reasonableness exemption of § 1108(b)(2).  In 2012, it enacted regulations governing disclosure requirements for pension plans. 29 C.F.R. § 2550.408b-2.  In doing so, it defined a "covered service provider" as "a service provider that enters into a contract or arrangement with a covered plan [*i.e.*, an employee pension plan] and reasonably expects $1,000 or more in compensation, direct or indirect, in connection with providing [services to the plan]." 29 C.F.R. § 2550.408b-2(c)(1)(iii).  The DOL explained that "**[n]o** contract or arrangement for services between a covered plan [i.e., pension plan] and a covered service provider, **nor any extension or renewal,** is reasonable within the meaning of section 408(b)(2) [*i.e.*, 1108(b)(2)] of the Act [unless the requirements

of the regulation] are satisfied."  29 C.F.R. § 2550.408b-2(c)(1)(i).  The

requirements include provider disclosures about services, status, compensation,

and other matters, 29 C.F.R. § 2550.408b-2(c)(1)(iv), and these disclosures must

be provided "reasonably in advance of the date **the contract or arrangement is**

**<u>entered into</u>**, and **<u>extended or renewed</u>**. . . ."  29 C.F.R. § 2550.408b-

2(c)(1)(v)(A).

Thus, the regulations unambiguously cover initial provider contracts since

they cover all service contracts and, separately, all their extensions and renewals.

This interpretation is confirmed in the preamble to these regulations, which states:

"The furnishing of goods, services, or facilities between a plan and a party in

interest to the plan generally is prohibited under section 406(a)(1)(C) of ERISA.

As a result, a service relationship between a plan and a service provider would

constitute a prohibited transaction, because any person providing services to the

plan is defined by ERISA to be a "party in interest" to the plan. However, section

408(b)(2) of ERISA exempts certain arrangements between plans and service

providers that otherwise would be prohibited transactions under section 406 of

ERISA."  77 Fed.Reg. 5632 (Feb. 3, 2012).

The 2021 Amendments in the Consolidated Appropriations Act of 2021

("CAA") confirm Congress's agreement with the DOL that § 1106 prohibits

transactions in connection with the initial furnishing of services unless a § 1108

exemption applies.  Pub.L. 116-260, Div. BB, Title II, § 202(a), Dec. 27, 2020, 134

Stat. 2894 (adding all of section (b)(2)(B) to 29 U.S.C. § 1108).   These

amendments extend the DOL disclosure requirements for pension plans to group

health plans.  The CAA added 29 U.S.C. § 1108(b)(2)(B)(i) and, copying the

language in 29 C.F.R. § 2550.408b-2, states: "**No** contract or arrangement for

services between a covered plan [*i.e.*, a group health plan] and a covered service

provider, and no **extension or renewal** of such a contract or arrangement, is

reasonable within the meaning of this paragraph unless the requirements of this

clause are met."

The CAA then defines a "covered service provider" using the same language

as the DOL regulations: "a service provider that enters into a contract or

arrangement with a covered plan [*i.e.*, a group health plan] and reasonably expects

$1,000 or more in compensation, direct or indirect, in connection with providing

[services to the plan]." *Cf.* 29 U.S.C. § 1108(b)(2)(B)(ii)(I)(bb) *with* 29 C.F.R.

§ 2550.408b-2(c)(1)(iii).  The CAA, like the DOL, also declares that "**[n]o** contract

or arrangement for services between a covered plan [group health plan] and a

covered service provider, **nor any extension or renewal,** is reasonable within the

meaning of this paragraph unless the requirements of this clause are met."  *Cf.* 29

U.S.C. § 1108(b)(2)(B)(i) *with* 29 C.F.R. § 2550.408b-2(c)(1)(i).  And, like the

DOL regulations for pension plans, the CAA requires that necessary disclosures

for group health plans be made "reasonably in advance of the date on which **the contract or arrangement is <u>entered into</u>, and <u>extended or renewed</u>. . . ."** *Cf.* 29 U.S.C. § 1108(b)(2)(B)(v)(I) *with* 29 C.F.R. § 2550.408b-2(c)(1)(v)(A).

The CAA, particularly when read in conjunction with the exemption requirements for the establishment of a plan, further confirms that service providers are parties in interest for purposes of both initial and subsequent transactions.   If a new service provider for a *health plan* is a party in interest under § 1106(a)(1)(C), then is a new service provider for a *pension plan*.   Nothing suggests that Congress, for the first time since the passage of ERISA in 1974, intended for the CAA to provide divergent party-in-interest definitions – one for health plans and another for pension plans – through an amendment to the exemptions to prohibited party in interest transactions.   The consequence of concluding it did would be disruptive and incoherent.   Assigning different definitions to a term used in §§ 1002, 1106, and 1108, depending on the plan type, violates the canon of construction that "a word or phrase is presumed to bear the same meaning throughout a text."   *Reading Law,* Scalia and Garner (2012), p. 170. See also *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980) ("In the end, we cannot accept respondent's position without unreasonably giving the word 'filed' two different meanings in the same section of the statute.")

In fact, and more simply, the CAA just expanded the disclosure rules for health plans to make them comparable to the long-standing DOL rules for pension plans with appropriate disclosure differences for the two types of plans. In doing so, Congress confirmed its pre-existing understanding that <u>all</u> contracts with service providers, and not merely extensions and renewals, are transactions with parties in interest that require compliance with the § 1108 exemption.

### 3. The District Court Erred in Concluding the Natural Reading of "Party in Interest" Excludes Persons Unless They Are Already Providing Services at the Time of the Contested Transaction

In concluding VALIC was not a party in interest, the District Court reasoned that, while the phrase "a person providing" was ambiguous, the addition of the prepositional phrase "<u>to such plan</u>" limited the definition of party-in-interest to pre-existing providers. It supported this conclusion by observing that the party-in-interest definition's common theme appeared to be a concern that the fiduciary might be inclined to favor insiders at the expense of plan participants.

Plaintiffs respectfully disagree. When put in the context of §§ 1106 and 1108, the most natural reading of § 1002(14)(B) is one that considers "a person providing services to such plan" to be a party in interest if the transaction calls on them to provide services. Moreover, while Congress was surely concerned about fiduciaries favoring insiders, it was also concerned about plans being saddled with long-term, unreasonable, disadvantageous contracts, *Comerica Bank, supra,* 2012

WL 12948705, at *18 n.27, and Congress's overriding concern was the protection of plan participants and beneficiaries. 29 U.S.C. § 1001; *Ronches v. Dickerson Employee Benefits, Inc.*, No. 09-cv-04279, 2009 WL 10669571, at *18 (C.D. Cal. Oct. 30, 2009).

As the §§ 1106 and 1108 interplay demonstrates, ERISA prohibits unreasonable transactions with service providers, full stop.  It makes no difference if the cause of the prohibited transaction is a fiduciary's desire to favor insiders, its misplaced trust in a salesperson, a lack of sophistication, or something else.  "The danger of long-term contracts is only addressed if every service contract is required to be reasonable, rather than just successive contracts." *Comerica Bank, supra,* 2012 WL 12948705, at *18 n. 27.  The District Court's holding would result in a plan fiduciary, faced with a contract containing a penalty provision but no stated termination date, being permanently unable to escape the contract on behalf of the plan without penalty, plainly harming the interests of participants.  That is what Plaintiffs faced and what ERISA prohibits.

The circuit courts that have concluded an initial service provider is not a party in interest did not address the interplay between §§ 1106 and 1108 and did not have the benefit of Congress's 2021 amendments.  They also did not consider Congress's alternative reasons for placing reasonable restrictions on service contracts,  *e.g., Danza, supra,* 533 Fed.App'x at 125-126; *Ramos, supra,* 1 F.4th at

787, nor the issue of *Chevron* deference. *Ramos, supra,* at n.11.

These courts' rationales for excluding initial providers from the party in interest definition are also not compelling. For example, in *Ramos*, the Fourth Circuit stated it would be absurd for the initial agreement with a service provider to simultaneously transform that provider into a party in interest and make that same transaction prohibited under § 1106. *Id.* at 787. This is not absurd, nor circular, at all. An employment contract with a person can simultaneously make the person an employee <u>and</u> subject the contract to regulation under employment laws. A rental agreement can simultaneously make a person a renter <u>and</u> subject the agreement to fair housing laws. The same holds here.

The other rationale – that ERISA cannot be used to put an end to run-of-the mill service agreements, opening plan fiduciaries up to litigation because they engaged in arm's length deal with a service provider, *Ramos, supra,* 1 F.4th at 787 – is also uncompelling. ERISA, in fact, is intended to put an end to run-of-the-mill (and other) service agreements *unless* they satisfy a § 1108 exemption, e.g., they are reasonable and comply with other legal requirements. This is part of ERISA's comprehensive scheme to protect the retirement savings of U.S. workers.

Finally, there is the capriciousness inherent in an interpretation of party in interest that excludes a service providers' initial contract but not others. Why would Congress require a second contract to be reasonable, but not the first?

Moreover, a relationship between a plan and service provider often involves more than one contract.  Here, for example, there is evidence to suggest that Plaintiffs signed the service provider agreement on May 10 and the annuity contract on May 18.  Under the District Court's rationale, that means VALIC was a party in interest at the time it entered into the annuity contract.  Thus, Plaintiffs have adequately alleged the annuity contract – but not the provider agreement – is a prohibited transaction.  If, on the other hand, Plaintiffs had signed the annuity contract first, then VALIC would be a real party in interest for purposes of the provider agreement but not the annuity contract.  The definition of real party in interest cannot possibly depend on the order in which contracts are signed, but that is the consequence of the District Court's ruling.

For these reasons, the Court should conclude that a service provider is a real party in interest when entering into initial, extended, and renewed contracts with ERISA plans.

**4.     The Court Should Defer to the DOL's Interpretation that Service Providers Are Parties in Interest at the Time of the Initial Contracting**

At a minimum, the ERISA statute is ambiguous with respect to the meaning of party in interest as it relates to a person providing initial services to a plan.  Thus, the DOL's interpretation in entitled to deference under *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778 (1984).

*Meredith v. Times Ins. Co.*, 980 F.2d 352, 358 (5th Cir. 1993).  The District Court

erred in refusing to accord the DOL's interpretation this deference.

## D.     VALIC Was a Party in Interest at the Time It Transferred the Plan's Assets and Withheld the Surrender Fee

Section 1106(a)(1)(D) also prohibits a fiduciary from causing the plan to

engage in a transaction that constitutes "the transfer to, or use for the benefit of, a

party in interest of any assets of the plan."  Here, Plaintiffs caused the transaction

that resulted in the transfer of 4.5% of the Plan's assets to VALIC.  But for

Plaintiffs' insistence that VALIC transfer the Plan's assets to a new service

provider, VALIC would not have imposed the surrender fee.  Indeed, if permitted

to amend their complaint, Plaintiffs would and could allege that VALIC even

insisted on a new agreement that included a release of claims as a condition of

transferring the Plan's assets.

Still, the District Court concluded that, while VALIC was likely a party in

interest at the time it transferred the Plan's assets and imposed the surrender fee,

Plaintiffs did not cause this transaction by seeking the transfer of assets to a new

provider.  Rather, Plaintiffs caused this transaction two years prior, when they first

entered into the annuity contract.  Thus, the transfer and withholding was not a

prohibited transaction.  (ROA.1328.)  The District Court relied on *Chavez v. Plan

Benefits Serv. Inc.*, No. AU-17-CA-00659-SS, 2018 WL 6220119 (W.D. Tex. Sept.

12, 2018) in reaching this conclusion.

In *Chavez,* the district court held that a fiduciary does not a cause a transaction when it complies with a pre-existing contractual obligation to pay a provider's fees of the sort at issue in *Santomenno* and *Danza*, *i.e.*, a fixed pre-determined fee. *Chavez*, *supra*, 2018 WL 6220119, at * 3-4 n.4. In this case, however, there was no pre-existing contractual obligation to pay a fee. The obligation to pay the fee arose only after: (1) Plaintiffs caused VALIC to transfer its assets to a new provider, and (2) VALIC deliberated and decided to impose the fee, thus taking Plan assets for its own benefit. This was a transaction separate and distinct from the initial execution of the annuity contract.

This case is closer to *Peters v. Aetna*, 2 F.4th 199 (4th Cir. 2021) than to *Chavez*. In *Peters,* the Fourth Circuit concluded that a service provider's receipt of questionable fees pursuant to a pre-existing service contract could be a prohibited transaction within the meaning of § 1106(a). *Id.* at 240. It reasoned: "Specifically, based on the totality of the record, a reasonable factfinder could determine that [the provider] 'had actual or constructive knowledge of the circumstances that rendered [the bundled rate framework] unlawful.'" *Id.* It is the same here. Plaintiffs retained counsel, requested a waiver of the surrender fee (as they were instructed to do), and explained that the fee was an unlawful termination penalty under ERISA. (ROA.017.) VALIC, while a party in interest, knew of the circumstances that rendered the fee unlawful, yet imposed the fee anyway by withholding it from the

Plan's assets upon their transfer. (ROA.017.)

The transfer of assets and imposition of the fee was thus a separate and distinct prohibited transaction within the meaning of § 1106(a).

## E.   The District Court Abused Its Discretion in Denying Plaintiffs Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) requires that a court freely give leave to amend when justice so requires. "The liberal standard for amending under Rule 15(a)(2) is especially important when the law is uncertain," and, ordinarily, "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try and amend her complaint before the entire action is dismissed." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 519, 520 (7th Cir. 2015). The circumstances under which Rule 15(a) permits denial of leave to amend are limited, *Ynclan v. Dep't of Air Force,* 943 F.2d 1388, 1391 (5th Cir. 1991), and when a district court denies a plaintiff an opportunity to amend, "its decision will be reviewed rigorously on appeal." *Runnion*, *supra,* 786 F.3d at 519.

In deciding to grant or deny leave to amend, a district court must take into account factors "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment. . . . The district court may also consider whether

undue prejudice to the movant will result from denying leave to amend." *Bamm Inc. v. GAF Corp.*, 651 F.2d 389, 391 (5th Cir. 1981).

Here, none of the factors permitting denial of leave to amend are present, and the refusal to grant leave to amend would result in undue prejudice to Plaintiffs.

Plaintiffs did not engage in undue delay. When the District Court denied leave to amend, the case had been pending in the District Courts for almost one year and ten months. (ROA.005, 010-11.) Defendants' motions were under submission with a court for about sixteen of those months.[9] The other six months consisted of motion practice where Plaintiffs, at Defendants' request, granted them reasonable extensions of time to file their motions, which the District Court then approved. (ROA.005-006, 008.) Plaintiffs should not be penalized for delay attributable to the District Court's careful consideration of Defendants' motions, *Bamm, supra,* 651 F.2d at 392, nor should they be penalized for court-approved delays arising from the common courtesy of granting a party reasonable extensions.

---

[9] Defendants' first motions to dismiss were submitted on April 2, 2021, and denied as moot on March 25, 2022. (ROA.007-008.) Briefing on Defendants' renewed motions to dismiss was completed on June 6, 2022, and the District Court denied leave to amend and entered judgment on October 5, 2022. (ROA.010.)

There is no evidence of bad faith or dilatory motive.  As the District Court's order makes clear, this case presents a number of unsettled questions of law.  Had the District Court followed the reasoning of *Hi-Lex, Branden,* or *Perkins*, the motions to dismiss would have been denied.  Plaintiffs requested leave to amend in response to both Defendants' initial and renewed motions to dismiss.  It would have made no sense – and would have led to the potential waste of resources – for Plaintiffs to file an amended complaint (or seek leave to file an amended complaint) while Defendants' motions were pending when there was good reason to believe the complaint already stated viable claims.

There have been (1) no repeated failures to cure deficiencies by amendments previously allowed, (2) no undue prejudice to the opposing party by virtue of allowing of the amendment, and (3) no showing that the amendment would be futile.  The District Court criticized Plaintiffs for not unambiguously identifying all the allegations that might cure the complaint's deficiencies, but that would have been impossible without first knowing how, or even if, the court might find the complaint deficient.  And, in fact, Plaintiffs did identify both additional allegations and alternative legal theories that would support granting leave to amend. (ROA.710-713, 733-734.)  "Amendment should be refused only if it appears to a certainty that plaintiff cannot state a claim." *Runnion, supra,* 786 F.3d at 520. That is not the case here.

It is federal policy to resolve cases on the merits rather than on technicalities. The District Court abused its discretion, and unduly prejudiced Plaintiffs, in denying them leave to amend.

## VI.     CONCLUSION

For all these reasons, Appellants-Plaintiffs ask that the Court reverse the judgment of the District Court and conclude Plaintiffs' complaint states viable claims for breach of fiduciary duty and knowing participation in a prohibited transaction. Alternatively, Appellants-Plaintiffs ask the Court to conclude that the District Court erred in denying them leave to amend. Appellants-Plaintiffs also ask that the case be remanded to the District Court for further proceedings.

Respectfully submitted,


_____/S/ Chris Baker_____
Chris Baker
Baker Curtis & Schwartz, PC
1 California Street, Suite 1250
San Francisco, CA 94111
(415) 433-1064

# **CERTIFICATE OF SERVICE**

I, Chris Baker, certify that on February 16, 2023, I electronically filed the foregoing brief with the Clerk of the Court for United States Court of Appeals for the Fifth Circuit via the NextGen CM/ECF (PACER) filing system, which will send out a notice of such filing to all registered NextGen CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


      /S/ Chris Baker
      Chris Baker
      Baker Curtis & Schwartz, P.C.
      1 California Street, Suite 1250
      San Francisco, CA 94111
      (415) 433-1064

# <u>CERTIFICATE OF COMPLIANCE</u>

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1, this document contains 10,654 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word (Microsoft Office 2016) in 14-point Times New Roman font.

3.  I further certify that (a) required privacy redactions have been made, 5TH CIR. R. 25.2.13; (b) the electronic submission is an exact copy of the paper document, 5TH CIR. R. 25.2.1; and (c) the document has been scanned for viruses with the most recent version of a commercial virus-scanning program and is free of viruses.

/S/ Chris Baker
Chris Baker
Baker Curtis & Schwartz, P.C.
1 California Street, Suite 1250
San Francisco, CA 94111
(415) 433-1064