No. 22-20540

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

D.L. MARKHAM, *et al.*,

Plaintiffs-Appellants,

v.

VARIABLE ANNUITY LIFE, *et al.*,

Defendants-Appellees.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS

———————————

BRIEF OF THE SECRETARY OF LABOR AS AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS-APPELLANTS

———————————

SEEMA NANDA
Solicitor of Labor

WAYNE R. BERRY
Acting Associate Solicitor
  for Plan Benefits Security

JEFFREY HAHN
Counsel for Appellate and Special
  Litigation

DANIEL COLBERT
Trial Attorney

United States Department of Labor
Office of the Solicitor
Plan Benefits Security Division
200 Constitution Ave. NW, N-4611
Washington, DC 20210
(202) 693-5308
*Counsel for the Secretary of Labor*

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................... i

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE .......... 1

STATEMENT OF THE CASE ............................................................................ 2

    I.    The Facts ................................................................................................ 2

    II.    Proceedings Below ................................................................................ 3

SUMMARY OF ARGUMENT .......................................................................... 4

ARGUMENT ..................................................................................................... 7

    I.    Statutory and Regulatory Background ................................................. 7

    II.    The District Court Erred in Holding that VALIC Was Not a Party in Interest ................................................................................................... 9

        A.    The definition of "party in interest," together with other provisions of ERISA, indicates that initial service contracts are prohibited transactions ....... 9

        B.    Prohibiting initial service contracts absent an exemption is consistent with ERISA's purposes ................................................................. 18

    III.    Even if VALIC's Contract with Markham Was Not a Prohibited Transaction, VALIC's Post-Contract Actions Qualify as Such .......................... 25

CONCLUSION ................................................................................................ 27

CERTIFICATE OF COMPLIANCE ................................................................ 29

# TABLE OF AUTHORITIES

**Federal Cases:**

*Barboza v. California Ass'n of Prof. Firefighters*,
    799 F.3d 1257 (9th Cir. 2015) ...................................................................... 18 n. 3

*BP America, Incorporated v. FERC*,
    52 F.4th 204 (5th Cir. 2022) ........................................................................... 11

*Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*,
    472 U.S. 559 (1985) ......................................................................................... 18

*Commissioner v. Keystone Consol. Industries, Inc.*,
    508 U.S. 152 (1993) ......................................................................................... 18

*Danza v. Fidelity Management Trust Co.*,
    533 F. App'x 120 (3d Cir. 2013) .................................................................. 21 n. 4

*Donovan v. Cunningham*,
    716 F. 2d 1455 (5th Cir. 1983) ....................................................................... 20

*Haig v. Agee*,
    453 U.S. 280 (1981) ......................................................................................... 14

*Harris Trust and Sav. Bank v. Salomon Smith Barney*,
    530 U.S. 238 (2000) ...................................................................................... 7, 18

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996) ..................................................................................... 20-22

*Mallard v. U.S. Dist. Court for Southern Dist. of Iowa*,
    490 U.S. 296 (1989) ........................................................................................... 9

**Federal Cases (continued):**

*Peters v. Aetna Inc.*,
 2 F.4th 199 (4th Cir. 2021) ...................................................... 21 n. 4

*Markham v. VALIC*,
 No. 22-0974, 2022 WL 5213229 (S.D. Tex., October 5, 2022) ................. passim

*Ramos v. Banner Health*,
 1 F. 4th 769 (10th Cir. 2021) .................................................. 15, 21 n. 4

*Sec'y of Labor v. Fitzsimmons*,
 805 F.2d 682 (7th Cir. 1986) .......................................................1

*Sellers v. Anthem Life Ins. Co.*,
 316 F. Supp. 3d 25 (D.D.C. 2018)...................................... 15-17, 17 n. 2

*Sweda v. Univ. of Pa.*,
 923 F.3d 320 (3d Cir. 2019)........................................................ 21 n. 4

*Tibble v. Edison Intern.*,
 135 S. Ct. 1823 (2015) ...............................................................18

*United States v. Wilson*,
 290 F.3d 347 (D.C. Cir. 2002).....................................................14

*Varity Corp. v. Howe*,
 516 U.S. 489 (1996)..................................................................19

**Federal Statutes:**

1 U.S.C. § 1 .............................................................................5, 9

Employee Retirement Income Security Act of 1974,
 as amended, 29 U.S.C. § 1001 et seq.,

Section 2(b), 29 U.S.C. § 1001(b) .............................................1

**Federal Statutes (continued):**

Section 3(14), 29 U.S.C. § 1002(14) ...................................................................13

Section 3(14)(B), 29 U.S.C. § 1002(14)(B).................................................... passim

Section 404(a), 29 U.S.C. § 1104(a)....................................................................6

Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) ...............................................3

Section 405(b)(2), 29 U.S.C. § 1105(b)(2) .........................................................20

Section 406(a), 29 U.S.C. § 1106(a)............................................................. passim

Section 406(a)(1), 29 U.S.C. § 1106(a)(1) ..........................................................19

Section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C)......................................... 3, 7, 27

Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) ..............................................27

Section 406(b)(1), 29 U.S.C. § 1106(b)(1) ............................................. 3, 17, 18 n.3

Section 408, 29 U.S.C. § 1108...........................................................................7

Section 408(b)(2), 29 U.S.C. § 1108(b)(2) ....................................... 1, 3, 11, 17, 20

Section 408(b)(2)(A), 29 U.S.C. § 1108(b)(2)(A)................................................7

Section 408(b)(2)(B)(i), 29 U.S.C. § 1108(b)(2)(B)(i).....................................5, 11

Section 408 (b)(2)(B)(iii), 29 U.S.C. § 1108(b)(2)(B)(iii) ....................................11

Section 408 (b)(2)(B)(iii)-(ix), 29 U.S.C. § 1108(b)(2)(B)(iii)-(ix) .......................13

Section 408(b)(2)(B)(v)(I), 29 U.S.C. § 1108(b)(2)(B)(v)(I)................................11

Section 408(b)(5), 29 U.S.C. § 1108(b)(5)..........................................................15

Section 408(b)(6), 29 U.S.C. § 1108(b)(6) ..................................................... 16-18

**Federal Statutes (continued):**

Section 408(c), 29 U.S.C. § 1108(c) ............................................................. 17 n. 3

Section 408(c)(2), 29 U.S.C. § 1108(c)(2) .............................................................17

34 U.S.C. § 12421(3) .............................................................10

**Federal Regulations:**

29 C.F.R. § 2550.408b-2(a) .............................................................17

29 C.F.R. § 2550.408b-2(c) .............................................................13

29 C.F.R. § 2550.408b-2(c)(3).............................................................3, 8

29 C.F.R. § 2550.408b-6(a) .............................................................17

Reasonable Contract or Arrangement Under Section 408(b)(2)-Fee Disclosure, 77 Fed. Reg. 5632 (Feb. 3, 2012) .........................................................8

**Miscellaneous:**

Fed. R. App. P. 29(a) .............................................................2

**Other Authorities:**

George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees* § 555 (rev. 2d ed 2022) ................................................................. 19, 20

H.R. Rep. No. 93-1280 (1974) (Conf. Rep.) .................................................... 16, 24

Restatement (Second) of Trusts § 171 cmt. f (Am. L. Inst. 1959) .........................19

**STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE**

The Secretary of Labor has the primary authority to interpret and enforce Title I of ERISA and is responsible for "assur[ing] the . . . uniformity of enforcement of the law under the ERISA statutes." *See Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 691–93 (7th Cir. 1986) (en banc). To that end, the Secretary has an interest in effectuating ERISA's purpose of "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." 29 U.S.C. § 1001(b). Among other standards of conduct, ERISA section 406(a) categorically prohibits certain transactions that carry a high risk to plan assets—specifically, those between a plan and a "party in interest" to the plan—subject to fairly broad exemptions. *See* 29 U.S.C. § 1106(a).

This case involves whether certain service providers to ERISA plans are "parties in interest" to the plans they service, and thus subject to ERISA section 406(a)'s prohibition on party-in-interest transactions. Contracts with service providers are among the transactions ERISA prohibits because they transfer responsibilities that would otherwise fall to plan fiduciaries, who are charged with duties of prudence and loyalty, to third parties whose interests may not align with the plan's. Recognizing that plans will often need to contract for services, Congresss simultaneously created a broad exemption for necessary services, so long as the compensation paid is reasonable. *See* 29 U.S.C. § 1108(b)(2). The

1

Secretary has an interest in ensuring that the Fifth Circuit properly interprets ERISA to make clear that a plan's initial contract with a service provider is a prohibited transaction unless an exemption is met. The Secretary submits this brief pursuant to Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE CASE

### I.  The Facts

Plaintiff D.L. Markham, DDS, MSD, Inc., is a dental practice that sponsors an employee pension benefit plan ("Plan"). *Markham v. VALIC*, No. 22-0974, 2022 WL 5213229, *1 (S.D. Tex., October 5, 2022). Markham is the administrator and named fiduciary of the Plan. *Id.* Defendant Variable Annuity Life Insurance Company (VALIC) is an insurance company that offers tax-qualified retirement plans. *Id.*

As alleged in the Complaint, Markham entered into a contract with VALIC in May 2018 to maintain the Plan on VALIC's retirement platform. *Id.* The contract provided for a 5% surrender charge on transfers out of VALIC's annuities on amounts contributed in the previous 60 months. *Id.* The contract provided that VALIC could waive the surrender fee if it chose. *Id.* at *1-2. In January 2020, Markham informed VALIC that it intended to terminate its contract with VALIC and move to a different service provider. *Id.* at *2. Markham asked VALIC to allow it to withdraw the Plan's assets without triggering the surrender fee, but

2

VALIC refused. *Id.* Markham transferred all Plan assets from VALIC's platform to its new service provider, and VALIC retained $20,703 as a surrender fee (about 4.5% of the Plan's assets). *Id.*

## II.    Proceedings Below

Markham and the Plan filed a putative class action against VALIC, asserting two claims under ERISA. Count I alleges that VALIC knowingly participated in a transaction between the Plan and a party-in-interest (VALIC) for the "furnishing of goods, services, or facilities," in violation of 29 U.S.C. § 1106(a)(1)(C). Count I further alleges that the contract does not qualify for the reasonable compensation exemption under 29 U.S.C. § 1108(b)(2) because of the 5% surrender charge. *See* 29 C.F.R. § 2550.408b-2(c)(3) ("No contract or arrangement is reasonable . . . if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous."). Count II alleges that by failing to waive the surrender charge and instead collecting it from Plan assets, VALIC breached its duty of loyalty to the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A), and engaged in self-dealing in violation of 29 U.S.C. § 1106(b)(1). *Id.*

VALIC moved to dismiss, arguing with regard to the prohibited transaction claim that it was not a party in interest because it was not "providing services" to

the Plan at the time it entered into its contract with Markham. *Id.; see* 29 U.S.C. §

1002(14)(B) (definition of "party in interest"). The district court granted VALIC's

motion, holding that a service provider is a party in interest at the time of a contract

with a plan only if it has a preexisting contractual relationship with the plan.

Because VALIC was not yet providing services to Markham at the time of the

contract containing the challenged surrender-charge provision, the court found that

it was not a party in interest, and thus that the transaction did not violate ERISA's

prohibited transaction rules. *Id.* at 9.

## SUMMARY OF ARGUMENT

Subject to several exemptions, ERISA prohibits certain transactions between

a plan and a "party in interest," 29 U.S.C. § 1106(a), a term that includes "a person

providing services to such plan." 29 U.S.C. §§ 1002(14)(B). Seizing on the

definition's present tense, the district court held that VALIC was not a party in

interest when it contracted to provide services to the Markham Plan because it did

not have a "preexisting relationship" with the Plan at the time of the contract. The

district court found further support for its interpretation in its belief that ERISA's

prohibited transaction rules are aimed only at "insider" transactions, and a service

provider without a preexisting relationship with the plan is not an insider. The

district court's interpretation—which would categorically exempt initial service

4

contracts from ERISA's prohibited transaction provisions—is wrong for a host of reasons.

First, as a matter of statutory interpretation, the definition of "party in interest" as including persons "providing services" to ERISA plans is at best ambiguous as to whether it extends to first-time service providers. 29 U.S.C. §§ 1002(14)(B). Indeed, the Dictionary Act makes clear that, "unless the context indicates otherwise . . . words used in the present tense include the future as well as the present." 1 U.S.C. § 1. And the context here, which includes the Department's past interpretation and surrounding provisions of ERISA, supports a reading that extends party-in-interest status to all service providers. In particular, Congress recently amended ERISA to explicitly require certain service providers to group health plans—in order to qualify for one of the prohibited transaction exemptions—to disclose their fees to the plan's fiduciaries prior to entering *both* renewal contracts *and* initial contracts. In doing so, Congress clearly indicated that initial service contracts would be prohibited transactions absent the requisite disclosures. *See* 29 U.S.C. § 1108(b)(2)(B)(i).

Including all service providers in ERISA's party-in-interest definition also is consistent with ERISA's purposes and reflective of its roots in the law of trusts. ERISA's prohibited transaction rules broadly protect against transactions that pose an elevated risk to plan assets—in the case of service providers, a risk arising from

the assignment of duties by the plan's entrusted fiduciaries to outside parties whose interests may not align with the plan's. That is precisely why trust law traditionally prohibited fiduciaries from assigning their responsibilities to third parties.

Moreover, the district court's interpretation would create perverse incentives and would allow fiduciaries and service providers to easily manipulate the prohibited transaction rules. For example, if initial contracts with service providers were not prohibited, fiduciaries would be incentivized to lock service providers into contracts of indefinite length, which, in the district court's view, would never qualify as prohibited transactions no matter how unreasonable the agreed compensation. That concern is underscored by the district court's separate holding that subsequent transactions pursuant to an initial service contract nevertheless do not qualify as transactions separate from the initial contract itself, and thus are also not prohibited. To make matters worse, the narrow rule espoused by the district court—that the prohibited transaction provisions reach only renewal contracts with preexisting service providers—could be easily evaded. Service providers with preexisting relationships to ERISA plans could simply allow their contracts to lapse, meaning they no longer would be "providing services" to the plan, and then enter a new contract the next day.

Because the district court's decision is contrary to ERISA's text, trust-law principles on which ERISA is based, and ERISA's broader purposes, this Court

should reverse the district court's dismissal of Plaintiffs' prohibited transaction claim.

## ARGUMENT

### I.  Statutory and Regulatory Background

In addition to the exacting fiduciary standards imposed by ERISA section 404, *see* 29 U.S.C. § 1104(a), section 406(a) of ERISA categorically prohibits fiduciaries from causing the plan to enter into a transaction with a "party in interest" to the plan, unless one of the statute's specified exemptions is satisfied. *See* 29 U.S.C. § 1106(a). As relevant here, section 406(a) states that, "[e]xcept as provided in section 1108 of this section, a fiduciary with respect to a plan shall not cause the plan to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C). A party in interest to an employee benefit plan includes "a person providing services to such plan." 29 U.S.C. § 1002(14)(B). A party in interest may itself be liable for knowingly participating in a fiduciary's violation of ERISA's fiduciary standards, including its prohibited transaction provisions. *See Harris Trust and Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 249-53 (2000).

However, ERISA section 408(b)(2) provides an exemption from section 406(a)'s prohibitions that allows "[c]ontracting or making reasonable arrangements

with a party in interest for office space, or legal, accounting, or other services

necessary for the establishment or operation of the plan, if no more than reasonable

compensation is paid therefor." 29 U.S.C. § 1108(b)(2)(A). The Department of

Labor promulgated a regulation clarifying what constitutes a "reasonable

arrangement" under section 408(b)(2). Among other things, the regulation provides

that "[n]o contract or arrangement is reasonable within the meaning of section

408(b)(2) of [ERISA] . . . if it does not permit termination by the plan without

penalty to the plan on reasonably short notice under the circumstances to prevent

the plan from becoming locked into an arrangement that has become

disadvantageous." 29 C.F.R. § 2550.408b-2(c)(3).

    The Department has interpreted ERISA's definition of "party in interest" to

include all persons providing services to ERISA plans, without distinction between

service providers entering into initial or renewal contracts. In the preamble to its

408(b)(2) rule, the Department explained that all service contracts are prohibited

transactions and must be reasonable in order to fall within section 408's

exemption. *See* Reasonable Contract or Arrangement Under Section 408(b)(2)-Fee

Disclosure, 77 Fed. Reg. 5632 (Feb. 3, 2012). As the Department stated, "a service

relationship between a plan and a service provider would constitute a prohibited

transaction because any person providing services to the plan is defined by ERISA

to be a 'party in interest.'" *Id.*

## II.    The District Court Erred in Holding that VALIC Was Not a Party in Interest

ERISA defines a "party in interest" to an employee benefit plan as including "a person providing services to such plan." 29 U.S.C. § 1002(14)(B). The district court held that because VALIC was not providing services to the Plan "when it entered the contract, the contract is not a § 1106(a) prohibited transaction." *Markham,* 2022 WL 5213229, at *9.[1] Read in the context of the statute as a whole and against the trust-law backdrop against which ERISA was enacted, a "party in interest" includes persons entering into initial contracts to provide services to plan, not only service providers who are already providing services to a plan at the time of the transaction in question.

### A.    The definition of "party in interest," together with other provisions of ERISA, indicates that initial service contracts are prohibited transactions

"Interpretation of a statute must begin with the statute's language." *Mallard v. U.S. Dist. Court for Southern Dist. of Iowa*, 490 U.S. 296, 300 (1989). The district court explained that "[t]he natural reading of the phrase 'a person providing

---

[1] As alleged in the Complaint, the contract at issue here is one to "maintain" the Plan on VALIC's retirement "platform." *See* Complaint at 3. However, as Appellants state in their opening brief (with citations to the contracts themselves), the Plan executed its annuities contract with VALIC (the contract containing the challenged surrender charge) after it had already executed its service contract with VALIC. If that is the case, then VALIC was indeed already providing services to the plan at the time of the annuities contract and was thus a party in interest even under the district court's conception of the term.

services to such plan' is that the person has started providing services or has at least agreed to do so." *Id*. at *9 (*quoting* 29 U.S.C. § 1002(14)(B)). But while "providing services" uses the present participle, that does not mean that it only refers to persons *already* providing services. To the contrary, the Dictionary Act commands that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words used in the present tense include the future as well as the present." 1 U.S.C. § 1. Indeed, the district court itself noted that one could use the same phrase to refer to someone "providing services at an upcoming event." *Markham,* 2022 WL 5213229, at *6. The district court thus acknowledged that "the language 'a person providing' does not on its own exclude either reading." *Id.*

The court instead placed greater emphasis on the three words following that phrase: "providing services *to such plan*." According to the court, this qualifier indicates that only those persons who have a preexisting agreement with the particular plan in question are parties in interest. *Id.* at *7 (emphasis added). But the district court itself provided an example of similar statutory language that does not necessarily imply a preexisting relationship. In the Violence Against Women Act, Congress required that grants should be awarded giving priority to "proposals providing services to culturally specific and underserved populations." 34 U.S.C. § 12421(3); *Markham,* 2022 WL 5213229, at *6. As the district court acknowledged,

10

such language does "not refer to ongoing services," but may include services that will be provided in the future. If providing services "to . . . underserved populations" can have such a meaning, then providing services "to such plan" can also refer to future services.

Other provisions in ERISA demonstrate Congress's intent to include new service providers within ERISA's definition of parties in interest. *See BP America, Incorporated v. FERC,* 52 F.4th 204, 215 (5th Cir. 2022) ("Context provided by surrounding language or statutory provisions can illuminate the meaning of an otherwise cryptic passage."). In 2021, Congress amended section 408(b)(2) of ERISA, which provides an exemption for an otherwise prohibited service contract between a plan and party in interest if the plan pays no more than "reasonable compensation." *See* 29 U.S.C. § 1108(b)(2). The amended provision now requires that before certain service providers to group health plans (referred to as "covered service providers") enter into a contract with group health plans (referred to as "covered plans"), they must disclose specified information to plan fiduciaries, or else the arrangement is unreasonable. *See* 29 U.S.C. § 1108(b)(2)(B)(i); *id.* § 1108(b)(2)(B)(iii) ("A covered service provider *shall* disclose to a responsible plan fiduciary, in the writing, the following:") (emphasis added).

Importantly, the amendment repeatedly makes clear that the required disclosures must be made *both* before a service provider enters into its initial

contract with a plan *and* before any renewals or extensions of that contract. For example, the amended provision states that "[n]o contract or arrangement for services between a covered plan and covered service provider, *and* no extension or renewal of such a contract or arrangement, is reasonable within the meaning of this paragraph unless the requirements of this clause are met." *Id.* (emphasis added). The statute elsewhere reiterates that these disclosures must be made "in advance of the date on which the contract or arrangement is entered into, *and* extended or renewed." 29 U.S.C. § 1108(b)(2)(B)(v)(I) (emphasis added). By distinguishing between contracts first "entered into" and those that are "extended or renewed"— and requiring that service providers make the required disclosures in advance of both—the statute makes clear that initial contracts with covered service providers would be prohibited transactions absent the required disclosures, just like renewal contracts. And if an initial contract with a covered service provider is a prohibited transaction absent the disclosure, the service provider must necessarily be a party in interest at the time of the initial contract (or else the contract would not be prohibited).

The district court reasoned that because the section 408(b)(2) amendments only apply to certain service providers to group health plans ("covered service providers"), they do not imply anything about Congress's broader understanding of when service providers writ large qualify as parties in interest. *See Markham*, 2022

12

WL 5213229, at *8. But "covered service providers" are merely a subset of the larger category of persons "providing services to such plan" under ERISA's party-in-interest definition, 29 U.S.C. § 1002(14)(B); if a "covered service provider" was not a party in interest, its contract with a plan would not be a prohibited transaction and there would be no need for Congress to specify how its contract may qualify for section 408(b)(2)'s reasonable compensation exemption. Thus, by requiring covered service providers to make the requisite disclosures prior to their initial contracts with plans, section 408(b)(2)(B)—even if applicable only to service providers to group health plans—makes clear that the definitional phrase "a person providing services to such plan" reaches first-time service providers.

Interpreting section 408(b)(2)(B) to reflect Congress's understanding that all initial contracts with service providers are prohibited transactions is the most reasonable reading of the amendment. It is theoretically possible that section 408(b)(2) merely requires covered service providers to make the required disclosures in advance of their initial contracts *only* if they already are parties in interests for some *other reason* independent of the initial contract—either because they are currently providing some different service to the plan at the time of the contract, or because they fit within one of the other party-in-interest categories (e.g., if a service provider is the employer-sponsor of the plan). *See* 29 U.S.C. § 1002(14) (listing those who qualify as parties in interest). But it would be odd for

Congress to create extensive disclosure requirements for such a narrow range of service providers. *See* 29 U.S.C. § 1108(b)(2)(B)(iii)-(ix). The more natural reading is that Congress intended to apply these disclosure requirements to *all* service providers to ERISA-covered group health plans.

Indeed, when it enacted section 408(b)(2)(B), Congress copied the disclosure requirements nearly verbatim from the Department's section 408(b)(2) regulation (which applies to *all* service providers who expect to receive more than $1000 in compensation). *Compare* 29 U.S.C. § 408(b)(2)(B), *with* 29 C.F.R. § 2550.408b-2(c). In doing so, it is appropriate to presume that Congress was aware of the Department's interpretation that all service-provider contracts were subject to the regulation, as stated in the rule's preamble and as established by the Department's enforcement practices. *See Haig v. Agee*, 453 U.S. 280, 297–98 (1981) (concluding that when Congress passed the Passport Act of 1926, it "adopted the longstanding administrative construction of the 1856 [Passport Act]," as interpreted by the Secretary of State through regulations); *United States v. Wilson*, 290 F.3d 347, 356 (D.C. Cir. 2002) ("Our interpretation of § 1975(c) is further confirmed by background considerations such as relevant practices of the Executive Branch. Congress is presumed to preserve, not abrogate, the background understandings against which it legislates."). The most plausible interpretation of section 408(b)(2)(B), then, is that Congress was aware of the Department's

understanding that all service providers are parties in interest subject to its disclosure rules, that Congress approved of this understanding, and that Congress adopted analogous disclosure rules with that understanding in mind.

The district court's decision relied in part on the Tenth Circuit's reasoning in *Ramos v. Banner Health*, 1 F. 4th 769, 787 (10th Cir. 2021), which itself relies in significant part on the textual arguments in *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25 (D.D.C. 2018). That district court decision looked to other section 408 exemptions to infer that initial service contracts were not prohibited transactions, but in doing so misconstrued those exemptions. *Id.* at 35-38.

First, the *Sellers* court pointed to section 408(b)(5), which exempts contracts for life insurance, health insurance, and annuities between the plan and a licensed insurer if the insurer is (a) the employer sponsoring the plan or (b) a party in interest owned by the employer (or owned by another party in interest). 29 U.S.C. § 1108(b)(5). The court in *Sellers* explained that this exemption makes no sense if all service contracts are prohibited transactions: "why exempt only insurers that have a clear conflict of interest, allowing them to sell insurance for 'no more than adequate consideration,' while completely prohibiting contracts with other, disinterested insurers?" *Sellers*, 316 F. Supp. 3d at 35.

The Sellers court erroneously assumes that disinterested insurers would be prohibited from offering insurance or annuities to plans, while "conflicted"

15

insurers have access to an exemption. However, *all* insurance or annuities providers would still have access to the section 408(b)(2) exemption for necessary services. Section 408(b)(5) merely provides an additional, explicit exemption for purchases of insurance and annuities from employers who happen to be licensed insurers. This serves the Congressional purpose that the Sellers court noted: to avoid requiring an employer who is an insurer to purchase insurance from a different company. *See* H.R. Rep. 93-1280, at *56 (1974) (Conf. Rep.) ("it would be contrary to normal business practice to require the plan of an insurance company to purchase its insurance from another insurance company.").

The court in *Sellers* also pointed to section 408(b)(6), which exempts "any ancillary services" provided to a plan by a bank "if such bank . . . is a fiduciary of such plan," so long as the ancillary services are exchanged for reasonable compensation and the bank has adopted certain safeguards consistent with sound banking practice. 29 U.S.C. § 1108(b)(6). The *Sellers* court similarly reasoned that if all service contracts are prohibited transactions, "this exemption would be meaningless because the *core* service provided by the bank—that is, the service that caused the bank to become a fiduciary—would remain prohibited." *Sellers*, 316 F. Supp. 3d at 35.

The district court in *Sellers* misunderstood the purpose of the section 408(b)(6) exemption. The exemption refers to situations where the bank is not a

mere service provider to a plan, but "a fiduciary of such plan." 29 U.S.C. §

1108(b)(6). In that situation, ERISA explicitly permits the bank to receive

compensation for its work as a fiduciary—its "core service" in this scenario—

through the exemption in section 408(c)(2), which allows fiduciaries to receive

reasonable compensation for their services. 29 U.S.C. § 1108(c)(2).[2] But as a

fiduciary, the bank normally *would not* be allowed to hire itself on the plan's

behalf to perform an ancillary service (*i.e.*, a service separate from its fiduciary

services), because that would be an act of self-dealing prohibited by section 406(b)

of ERISA. *See* 29 U.S.C. § 1106(b)(1); 29 C.F.R. § 2550.408b-6(a). That would be

true even if the bank paid itself reasonable compensation for the ancillary service,

because the reasonable compensation exemptions in section 408(b)(2) and (c)(2)

do not apply to fiduciary self-dealing. 29 C.F.R. § 2550.408b-2(a); 29 C.F.R. §

2550.408b-6(a) ("Such ancillary services include services which do not meet the

requirements of section 408(b)(2) of [ERISA] because the provision of such

services involves an act described in section 406(b)(1) of [ERISA]").[3] This means

---

[2] For this same reason, the *Sellers* court's concern that fiduciaries may be unable to obtain compensation if they are parties in interest beginning with their initial contract is unfounded. *See Sellers*, 316 F. Supp. 3d at 36-37.

[3] *Barboza v. California Ass'n of Prof. Firefighter*s, 799 F.3d 1257, 1269 (9th Cir. 2015) (the "exemption for reasonable compensation under 29 U.S.C. § 1108(c) does not apply . . . to a fiduciary who engages in a prohibited transaction under 29 U.S.C. § 1106(b)(1) . . . .").

that a fiduciary bank seeking to hire itself to perform ancillary services would require a separate exemption to do so; hence the need for section 408(b)(6), which is hardly "meaningless."

In short, even if ERISA's use of the present participle in defining service providers as parties in interest is ambiguous, both the Secretary of Labor and Congress itself have made clear that all service contracts between plans and parties in interest are prohibited absent an exemption.

## B. Prohibiting initial service contracts absent an exemption is consistent with ERISA's purposes

Aside from being compelled by the statutory language, interpreting ERISA to prohibit all contracts for services, including first-time contracts, absent a statutory exemption is consonant both with ERISA's trust-law roots and its purpose of protecting retirement benefits.

Congress enacted ERISA section 406(a) to supplement ERISA's fiduciary duties of loyalty, prudence, and care by categorically barring certain transactions that were "likely to injure the pension plan," including certain transactions between the plan and a party in interest. *Harris Trust*, 530 U.S. at 242 (quoting *Commissioner v. Keystone Consol. Industries, Inc.*, 508 U.S. 152, 160 (1993)); 29 U.S.C. § 1106(a)(1). In interpreting ERISA, the Supreme Court has "often noted that an ERISA fiduciary's duty is 'derived from the common law of trusts.'" *Tibble v. Edison Intern.*, 135 S. Ct. 1823, 1828 (2015) (quoting *Central States, Southeast*

18

*& Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985)). As a result, "the law of trusts often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).

Congress's wariness of contracts for services to ERISA plans has its origins in the law of trusts. Traditionally, trustees were not permitted to delegate their duties to third parties. The Second Restatement of the Law of Trusts—current at the time ERISA was enacted—states that "The trustee is under a duty to the beneficiary not to delegate to others the doing of acts which the trustee can reasonably be required personally to perform." Restatement (Second) of Trusts § 171 (1959). At that time, the assumption was that a trustee was hired intentionally, because of some skill or probity the trustee possessed; to delegate the trustee's duties to an agent would deny the trust the benefit of those attributes. George Gleason Bogert, et al., The Law of Trusts and Trustees § 555 (2022). ("The reasoning behind this rule [against delegation] was that the settlor of the trust had selected the trustee to carry out the terms of the trust because of the trustee's abilities.").

Though ERISA today separately allows fiduciaries to formally delegate their duties pursuant to the plan's delegation procedures, 29 U.S.C. § 1105(b)(2), ERISA's prohibited transaction provision reflects these trust-law concerns by

prohibiting fiduciaries from causing plans to retain service providers unless doing so is necessary and reasonable. *See* 29 U.S.C. § 1108(b)(2). In fact, ERISA's reasonable compensation exemption for prohibited service contracts nearly perfectly tracks the traditional exception. "The old nondelegation rule placed the burden squarely on the trustee to show that the agent's employment was necessary, that the trustee entered into a reasonable contract of employment with the agent, and that the agent rendered services to the trust." Bogert, The Law of Trusts and Trustees § 555 (2022). Likewise, section 408(b)(2) permits "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2). And importantly, being an exemption, the burden of proof lies with the party claiming entitlement to it (*i.e.*, the fiduciary). *Donovan v. Cunningham*, 716 F. 2d 1455, 1467-68, n.27 (5th Cir. 1983).

The district court found that its reading of ERISA's prohibited transaction provisions to exclude initial service contracts was consistent with the purpose of ERISA section 406, as articulated by the Supreme Court in *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996). The Court there noted that the prohibited transactions of section 406(a) "generally involve uses of plan assets that are potentially harmful to the plan." *Id.* at 893. The Supreme Court further described the listed prohibited

transactions as "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Id.* Relying on *Lockheed*, the district court reasoned that because service providers who lack a preexisting relationship with a plan are not "plan insiders," new contracts for services do not pose the risks that Congress sought to avoid in section 406. *Markham*, 2022 WL 5213229 at *8-9.[4]

The district court read too much into *Lockheed*, which did not even concern the definition of a "party in interest," let alone the extent to which plan service providers qualify as such. Rather, *Lockheed* considered whether the payment of plan benefits is a "transaction" within the meaning of section 406. *Lockheed*, 517 U.S. at 892. In concluding it was not, the Supreme Court, while characterizing the section 406 prohibited transactions as involving "plan insiders," nonetheless made clear that what those transactions ultimately "have in common" is the use of plan

---

[4] Other courts have relied on similar rationales to hold that initial service contracts are not prohibited transactions. *Ramos*, 1 F.4th at 787 ("ERISA is meant to prevent fiduciaries from engaging in transactions with parties with whom they have pre-existing relationships, raising concerns of impropriety."); *Peters v. Aetna Inc.*, 2 F.4th 199, 229 (4th Cir. 2021) ("'[I]f a service provider has no prior relationship with a plan before entering a service agreement, the service provider is not a party in interest at the time of the agreement.'") (*quoting Sweda v. Univ. of Pa.*, 923 F.3d 320, 337 n.12 (3d Cir. 2019)); *Danza v. Fidelity Management Trust Co.*, 533 F. App'x 120, 125 (3d Cir. 2013) ("Negotiation between such unaffiliated parties does not fall into the category of transactions that Section 406(a) was meant to prevent.").

assets in ways "potentially harmful to the plan," a characteristic that the payment of benefits to participants does not share. *Id*. at 893.

But as discussed above, a fiduciary contracting out to a service provider *is* "potentially harmful to the plan" even when the service provider is not a "plan insider." Such outsourcing very much was a concern at trust law and implicates similar concerns over the use of plan assets as the other species of prohibited transactions because they transfer responsibilities that would otherwise fall to plan fiduciaries, who are charged with duties of prudence and loyalty, to third parties whose interests may not align with the plan's. Regardless, the Court made clear in *Lockheed* that it was not purporting to give the final word on the full contours of what is prohibited by ERISA section 406(a)(1)(C): "In short, whatever the precise boundaries of the prohibition in § 406(a)(1)(D), there is one use of plan assets that it cannot logically encompass: a quid pro quo between the employer and plan participants in which the plan pays out benefits to the participants pursuant to its terms." *Id.* at 895.

In addition, the district court's policy-based logic (and those of the circuit court decisions on which it relied) does not withstand scrutiny. The district court explained that only a service provider with a "preexisting relationship with the plan" poses the kind of "insider risk" akin to the other persons identified in ERISA's party-in-interest definition. *Markham*, 2022 WL 5213229, at *7. But the

notion that Congress was concerned with "preexisting relationships" when it prohibited contracts with service providers is belied by the fact that Congress did *not* prohibit contracts with other preexisting vendors to the plan. A plan could have the same long-term relationship with, say, a vendor of goods or financial products as it could with a service provider, yet vendors providing goods to a plan are not parties in interests, *see* 29 U.S.C. § 1002(14), and transactions with such vendors are accordingly not prohibited (unless the vendor is a party in interest for some other reason). This indicates that the risks Congress sought to protect against when barring service-provider contracts were the risks unique to *service* contracts, not those arising from preexisting relationships. These risks—identified above and understood at the time of ERISA's enactment—would necessarily be present in *all* service contracts.

Moreover, the district court's reading would not even encompass all contracts with service providers with significant preexisting relationships with a plan, further undercutting the notion that such relationships were Congress's chief concern. For example, if a service provider worked for a plan for 10 years, and then, after a two-month hiatus, entered a new contract with the plan, that transaction would not be prohibited (under the district court's reading) despite the fiduciary having a longstanding preexisting relationship with the service provider.

23

Indeed, carving out first-time service providers from the parties-in-interest category would create a strange loophole where the first contract would be immune from section 406 claims, but renewed contracts would not. This would create incentives for plan fiduciaries to behave in ways that are inimical to the plan's interests and contrary to ERISA's purposes. Fiduciaries would be incentivized to seek new service providers instead of renewing existing contracts, even if those existing providers are the best choice for the plan. They would be encouraged to enter into long or even indefinite initial service contracts, which—under the district court's interpretation—would be forever immune from ERISA's prohibited transactions no matter how unreasonable their terms, in contravention of Congress's goal of preventing plans from becoming "locked into an arrangement that may become disadvantageous." H.R. Rep. No. 93-1280, at *54 (1974) (Conf. Rep.). And fiduciaries and service providers could easily skirt the prohibited transaction rules *even* as applied to renewal contracts, simply by letting an initial contract lapse—thus shedding the service provider's party-in-interest status—and then executing a new contract.

In contrast, treating all service providers as parties in interest serves ERISA's purposes by permitting fiduciaries to expend plan assets to contract for services only when necessary, when part of a reasonable arrangement, and when the fees charged are reasonable. There is no reason that this statutory framework

24

should apply only to renewal contracts with service providers but not to initial contracts.

### III. Even if VALIC's Contract with Markham Was Not a Prohibited Transaction, VALIC's Post-Contract Actions Qualify as Such

In opposing VALIC's motion to dismiss, plaintiffs argued that even if Markham's initial contract with VALIC was not a prohibited transaction, VALIC's subsequent retention of its surrender fee certainly was. The district court rejected this argument based on its erroneous belief that a risk of favoritism borne of a preexisting relationship is the only concern animating ERISA's prohibited transactions. According to the court, interpreting VALIC's retention of the surrender fee as a separate transaction would "undermine the limitation of § 1106(a) scrutiny to service providers that have preexisting relationships with the serviced plan." *Markham*, 2022 WL 5213229, at *10. And because the court understood preexisting relationships to be Congress's sole concern, the court reasoned that "when a service provider collects a predetermined fee in accordance with the initial contract's terms, that collection is not a separate transaction." *Id.* As explained above, the district court is incorrect that Congress barred service provider contracts due to the risks inherent in preexisting relationships, so its analysis is faulty for that reason alone.

To the contrary, the central purpose behind section 406(a)'s ban on service contracts with parties in interest—to circumscribe a fiduciary's ability to transfer

its obligations to third parties—would be eviscerated under the district court's reasoning. According to the court, so long as a fiduciary hires a service provider who is not already providing some other service to the plan, not only is the contract itself immune from section 406's prohibitions, but so is everything that comes afterward. Under this view, a fiduciary could lock a plan into a patently unreasonably arrangement with a service provider indefinitely—overpaying the provider for years on end for unnecessary services—and none of it would come within the purview of section 406.

That is so even if the subsequent post-contract activity unquestionably qualifies as a "transaction" between a plan and a "party interest." *See* 29 U.S.C. § 1106(a). Indeed, the district court itself agreed that a service provider is a party in interest the moment the contract is executed, because at that point it is "providing services" to the plan. 29 U.S.C. § 1002(14)(B); *Markham*, 2022 WL 5213229, at *9. And whether predetermined in the contract language or not, post-contract activity certainly may qualify as a "transaction" within the meaning of section 406(a). *See* Black's Law Dictionary (11th ed. 2019) (defining "transaction" as "[t]he act or an instance of conducting business or other dealings; esp., the formation, *performance, or discharge of a contract*") (emphasis added). For example, when the fiduciary pays a service provider's invoice for services rendered, it is causing the plan to enter a transaction for the "furnishing of . . .

26

services . . . between the plan and party in interest." 29 U.S.C. § 1106(a)(1)(C). Yet in the district court's view, such textbook transactions with parties in interest would not, in fact, be prohibited by the statute that explicitly bars them.

Likewise here, when Markham withdrew from the contract subject to a surrender fee payable to VALIC—which at the time was indisputably a party in interest—it effectuated "a transfer to . . . a party in interest, of any assets of the plan," as prohibited by section 406(a)(1)(D). 29 U.S.C. § 1106(a)(1)(D). The act of withdrawing and incurring the surrender fee therefore constituted a prohibited transaction. Alternatively, to the extent that Markham (as the plan's fiduciary) was involved in directing plan assets into VALIC annuities (when those contributions were subject to a surrender fee in the event of withdrawal), the contributions arguably were transactions for services with a party in interest that the fiduciary caused the Plan to enter into, and were thus prohibited by section 406(a)(1)(C). 29 U.S.C. 1106(a)(1)(C).

## CONCLUSION

For the reasons stated above, the Secretary urges this Court to reverse the district court's dismissal of Plaintiffs' prohibited transaction claim.

February 23, 2023

SEEMA NANDA
Solicitor of Labor

WAYNE R. BERRY
Acting Associate Solicitor
  for Plan Benefits Security

JEFFREY HAHN
Counsel for Appellate and Special
  Litigation

Respectfully submitted,

s/ *Daniel Colbert*
DANIEL COLBERT
Trial Attorney

United States Department of Labor
Office of the Solicitor
Plan Benefits Security Division
200 Constitution Ave. NW
Room N-4611
Washington, DC 20210
colbert.daniel.j@dol.gov
(202) 693-5308

*Counsel for the Secretary of Labor*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(5), 32(a)(5)–(6), and 32(a)(7)(B), I certify on February 23, 2023, that this amicus brief uses a 14-point proportionally spaced typeface font (Times New Roman) and contains 6,412 words.

s/ *Daniel Colbert*
DANIEL COLBERT