No. 22-20540

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

D.L. MARKHAM DDS, MSD, INCORPORATED 401(K) PLAN;
D.L MARKHAM DDS, MSD, INCORPORATED, AS PLAN
ADMINISTRATOR,

*Plaintiffs-Appellants*,

v.

VARIABLE ANNUITY LIFE INSURANCE COMPANY;
VALIC FINANCIAL ADVISORS, INCORPORATED,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the Southern District of Texas

———————————

## BRIEF OF AMICUS CURIAE AMERICAN COUNCIL OF LIFE
## INSURERS IN SUPPORT OF APPELLEES AND AFFIRMANCE

———————————

Eric S. Mattson
Claire G. Lee
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

David Leifer
AMERICAN COUNCIL
OF LIFE INSURERS
101 Constitution Ave. NW
Washington, D.C. 20001
(202) 624-2311

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT AND
## CERTIFICATE OF INTERESTED PERSONS

Case No. 22-20540, *D.L. Markham DDS, MSD, Incorporated 401(k) Plan, et al. v. Variable Annuity Life Insurance Company, et al.*

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 28.2.1 of this Court's Rules, counsel for amicus curiae certify that amicus curiae is not a publicly owned corporation and does not have any parent company, subsidiary, or affiliate that has issued shares to the public.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made to enable the judges of this Court to evaluate possible disqualification or recusal.

**Parties**

- D.L. Markham, DDS, MSD, Inc. 401(k) Plan, *Plaintiff-Appellant*

- D.L. Markham, DDS, MSD, Inc. as plan administrator, *Plaintiff-Appellant*

- The Variable Annuity Life Insurance Company*, Defendant-Appellee*

- VALIC Financial Advisors, Incorporated, *Defendant-Appellee*

i

***Amicus Curiae***

- American Council of Life Insurers, *Amicus Curiae*

- U.S. Department of Labor, *Amicus Curiae*

**Counsel**

- Chris Baker, *Counsel for Appellants*

- Robert A. Dolinko, *Counsel for Appellants*

- David F. Crutcher, *Counsel for Appellants*

- John S. Edwards Jr., *Counsel for Appellants*

- David T. McDowell, *Counsel for Appellees*

- Charan M. Higbee, *Counsel for Appellees*

- James M. Chambers, *Counsel for Appellees*

- Eric S. Mattson, *Counsel for Amicus Curiae American Council of Life Insurers*

- Claire G. Lee, *Counsel for Amicus Curiae American Council of Life Insurers*

- David Leifer, *Counsel for Amicus Curiae American Council of Life Insurers*

- Seema Nanda, *Counsel for Amicus Curiae Department of Labor*

- Wayne R. Berry, *Counsel for Amicus Curiae Department of Labor*

- Jeffrey Hahn, *Counsel for Amicus Curiae Department of Labor*

- Daniel Colbert, *Counsel for Amicus Curiae Department of Labor*

*/s/ Eric S. Mattson*
Eric S. Mattson

*Counsel for Amicus Curiae
American Council of Life Insurers*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF INTERESTED PERSONS ........................................................................... i

STATEMENT OF INTEREST ...................................................................... 1

SUMMARY OF ARGUMENT ....................................................................... 3

ARGUMENT .................................................................................................. 5

I.    The 401(k) Landscape: the Service Provider Industry and Insurance Companies' Role in It ............................................................ 5

    A.    Service providers ........................................................................... 5

    B.    Fees for Plan Services ................................................................... 8

II.    A Service Provider Does Not Act as a Fiduciary in Assessing a Pre-Agreed Surrender Charge ............................................................... 9

III.    A Service Provider Is Not a Party in Interest Before Contracting with a Plan Fiduciary or When Collecting the Negotiated Charge ... 12

CONCLUSION ............................................................................................. 17

CERTIFICATE OF COMPLIANCE ........................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.,*
   47 F.4th 570 (7th Cir. 2022) ........................................................ 13, 14

*Allen v. GreatBanc Tr. Co.,*
   835 F.3d 670 (7th Cir. 2016) ............................................................. 14

*Cruson v. Jackson Nat'l Life Ins. Co.,*
   954 F.3d 240 (5th Cir. 2020) ............................................................... 8

*Davis v. Washington Univ.,*
   960 F.3d 478 (8th Cir. 2020) ............................................................. 10

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.,*
   530 U.S. 238 (2000) ................................................................... 12, 13

*Hecker v. Deere & Co.,*
   556 F.3d 575 (7th Cir. 2009) ....................................................... 10, 16

*Hughes v. Northwestern Univ.,*
   142 S. Ct. 737 (2022) ....................................................................... 15

*Landgraf v. USI Film Prods.,*
   511 U.S. 244 (1994) .......................................................................... 17

*LaRue v. DeWolff, Boberg & Assocs., Inc.,*
   552 U.S. 248 (2008) ............................................................................ 5

*Leimkuehler v. Am. United Life Ins. Co.,*
   713 F.3d 905 (7th Cir. 2013) ..................................................... 6, 7, 8

*McCaffree Fin. Corp. v. Principal Life Ins. Co.,*
   811 F.3d 998 (8th Cir. 2016) ......................................................... 9, 10

*Pegram v. Herdrich,*
   530 U.S. 211 (2000) ............................................................................ 9

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) .............................................................. 16

*Perez v. Bruister*,
   823 F.3d 250 (5th Cir. 2016) ............................................................ 14

*Ramos v. Banner Health*,
   1 F.4th 769 (10th Cir. 2021) ............................................................ 14

*Renfro v. Unisys Corp.*,
   671 F.3d 314 (3d Cir. 2011) .............................................................. 6

*Santomenno v. John Hancock Life Ins. Co. (U.S.A.)*,
   768 F.3d 284 (3d Cir. 2014) ............................................................ 10

*Santomenno v. Transamerica Life Ins. Co.*,
   883 F.3d 833 (9th Cir. 2018) ........................................................... 10

*Smith v. CommonSpirit Health*,
   37 F.4th 1160 (6th Cir. 2022) ......................................................... 15

*Stoneridge Inv. Partners, LLC v. Sci.–Atlanta, Inc.*,
   552 U.S. 148 (2008) ........................................................................ 16

## Statutes

29 U.S.C. § 1002(21)(A) ............................................................................ 9

29 U.S.C. § 1001 ......................................................................... *passim*

29 U.S.C. § 1104(a) ................................................................................. 12

29 U.S.C. § 1106 ..................................................................................... 12

29 U.S.C. § 1108(b)(2) ......................................................................... 4, 14

## Rules

29 C.F.R. § 404a-5 ................................................................................... 9

Fed. R. App. P. 29 .................................................................................... 1

## Other Authorities

Keith Clark, *The Defined Contribution Handbook* (2003) ......................7

McKinsey & Company, *Long-term value creation in US retirement* (Aug. 2019) ........................................................7

Plan Sponsor, *2022 Recordkeeping Survey* (July 21, 2022)....................6

*Plan Sponsor Activity & Engagement Set to Heighten, While Competition & Increasing Expectations for Plan Advisors Rise, According to Fidelity Study* (Aug. 23, 2022)..............................7

U.S. Dept. of Labor, *Prviate Pension Plan Bulletin* (Oct. 2022)...............................................................................6

**STATEMENT OF INTEREST**

Pursuant to Federal Rule of Appellate Procedure 29(a) and the consent of all parties, this brief is being filed by the American Council of Life Insurers, which supports Defendants-Appellees Variable Annuity Life Insurance Company and VALIC Financial Advisors, Inc. in seeking affirmance of the decision below.[1]

ACLI is the leading trade association driving public policy and advocacy on behalf of the life insurance industry. ACLI's member companies are dedicated to protecting consumers' financial well-being through life insurance, annuities, retirement plans, long-term care insurance, disability income insurance, reinsurance, and dental, vision, and other supplemental benefits. ACLI's 280 member companies represent 94 percent of industry assets in the United States.

ACLI advocates in state, federal, and international forums for public policy that supports the industry marketplace and the 90 million American families that rely on the life insurance industry for financial protection and retirement security. ACLI member companies are among the leading

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), ACLI states that no party's counsel authored this brief in whole or in part, and that no party, no party's counsel, and no other person contributed money intended to fund the brief's preparation or submission other than ACLI on behalf of its collective membership.

providers of retirement security products in both individual and group markets. ACLI members also provide recordkeeping and other administrative services in connection 401(k) and other types of retirement plans.

ACLI regularly advocates the interests of life insurers and their millions of policyholders and beneficiaries before federal and state legislators, state insurance commissioners, federal regulators, administration officials, and the courts. ACLI regularly files amicus briefs in cases like this one that involve issues of great importance to its members and their customers.

ACLI believes that the district court's decision was correct and that Plaintiffs' and the Department of Labor's core arguments conflict with reasonable and settled expectations about what the law requires, in particular the meaning of the keystone concepts of "fiduciary" and "party in interest" under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* ACLI's members have developed their business models in reliance on these settled principles. If the decision below were reversed, it could have significant consequences for the business

operations and risk profile of ACLI members—consequences that would ultimately harm retirement plans and their participants.

## SUMMARY OF ARGUMENT

The district court properly applied existing law, which carefully cabins the circumstances in which annuity providers and other service providers act as fiduciaries or parties in interest under ERISA. Plaintiffs' theories— supported by the Department of Labor with respect to "prohibited transactions"—would dramatically expand the circumstances in which these providers act as fiduciaries and parties in interest. If accepted, the theories would invite a new wave of ill-founded class actions and raise the costs of offering 401(k) and other retirement plans.

Under well-established law, service providers do not act as fiduciaries when they collect pre-determined fees like the annuity surrender charge at issue in this appeal. Nor are service providers "parties in interest" at the time they contract with plans or when they collect the fees negotiated in those contracts. These rules give service providers the appropriate freedom to negotiate their fees without the constraints of fiduciary status or the fear of being accused of participating in a prohibited transaction.

Imposing broad fiduciary status on service providers, as Plaintiffs request, would prompt some service providers to exit the marketplace and force others to raise their prices to account for the added litigation risk, leading to less choice, lower quality services, and higher prices. And accepting Plaintiffs' position, that a service provider is a fiduciary merely because its contract allows it to waive fees, would do nothing but harm plans. Service providers would simply stop including waiver provisions in their contracts for fear that they might lead to unintended fiduciary status.

Equally problematic—and in some ways more radical—is Plaintiffs' and the Department of Labor's argument that service providers are parties in interest when they first contract with plans. This would rewrite ERISA, but no court has adopted such an atextual view. If adopted, this reading of the law would make literally any transaction involving a plan a "prohibited" transaction. ***Every*** contract with a service provider would be presumptively prohibited, thereby encouraging single-plaintiff litigation and class actions over any and all contracts with service providers. And because exemptions to prohibited transactions, including those that allow otherwise prohibited transactions if they involve "reasonable compensation," 29 U.S.C. § 1108(b)(2), are generally thought to be affirmative defenses that cannot be

resolved at the outset of a case, many of these cases would proceed to costly discovery, resulting in defendants either settling dubious cases or incurring significant costs to litigate them to judgment. Far from protecting plans from injurious transactions, expanding "party in interest" status in this way would ultimately harm them. Litigation is not free, and those costs would either drive service providers out of the market or prompt them to raise their prices to account for this new and unexpected risk.

## ARGUMENT

### I.    The 401(k) Landscape: the Service Provider Industry and Insurance Companies' Role in It.

#### A.    Service providers

This case involves 401(k) plans, a species of "defined contribution" plans. Defined contribution plans provide a tax-advantaged way for workers to save for retirement, and, as the Supreme Court observed more than a decade ago, "dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255 (2008). In 401(k) plans, employees (and usually employers) contribute money on a tax-deferred basis to employees' accounts, and that money grows over time as it earns returns from investment options chosen by the plan sponsor and the employees. There are more than 600,000 defined contribution plans around the country,

covering over 70 million active participants. *See* U.S. Dept. of Labor, *Private Pension Plan Bulletin*, at 2 (Oct. 2022).[2] More than 86,000 defined contribution plans were added in 2021 alone. *See* Plan Sponsor, *2022 Recordkeeping Survey* (July 21, 2022).[3]

Service providers like Variable Annuity Life Insurance Company ("VALIC") play a vital but limited role in the operation of 401(k) plans. In this case, VALIC merely provided an annuity that served as the investment vehicle for money in the plan. In other cases, service providers offer technology-heavy recordkeeping, educational materials for participants, websites and mobile platforms participants use to access account information, and call centers. *See, e.g.*, *Renfro v. Unisys Corp.*, 671 F.3d 314, 318 (3d Cir. 2011) (noting provision of "administrative services bundled with the investment options"); *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 908-09 (7th Cir. 2013) (insurance company supplied retirement plan with investment platform and recordkeeping services). For the most part, the responsible plan fiduciaries of 401(k) plans are not equipped to perform these services.

---

[2] *Available at* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2020.pdf.
[3] *Available at* https://www.plansponsor.com/research/2022-recordkeeping-survey/.

The service provider industry is extremely competitive, and the intensity of the competition has recently neared an "all-time high." *See Plan Sponsor Activity & Engagement Set to Heighten, While Competition & Increasing Expectations for Plan Advisors Rise, According to Fidelity Study* (Aug. 23, 2022).[4] The competitors in the marketplace include not only insurance companies like VALIC, but also mutual fund companies, banks, consulting firms, third-party administrators, brokerage firms, accounting firms, and payroll providers. *See* Keith Clark, *The Defined Contribution Handbook*, 26-27 (2003). Because of the intensity of this competition, service providers typically earn "razor thin" margins. *See* McKinsey & Company, *Long-term value creation in US retirement*, at 2 (Aug. 2019).[5]

Like other insurers that serve retirement plans, VALIC provides its investment platform via an insurance product: a group variable annuity contract. *Leimkuehler*, 713 F.3d at 908. The assets in the contract are held in separate accounts. *Id.* In the insurance world, a separate account is just what it sounds like: an account separate from the company's general account.

---

[4] *Available at* https://newsroom.fidelity.com/pressreleases/plan-sponsor-activity-and-engagement-set-to-heighten--while-competition-and-increasing-expectations-/s/11ca39ab-0a83-4720-b44d-8e8ee94dc43d.

[5] *Available at* https://www.mckinsey.com/industries/financial-services/our-insights/long-term-value-creation-in-us-retirement#/.

*Id.* Participants in a 401(k) plan can select investment options like mutual funds through a separate account, in which case they experience the return of the underlying investment options without buying them directly. *Id.*

### B.    Fees for Plan Services.

All plan services have a cost. Plans pay for services in a variety of ways, including through fixed fees or asset-based fees, which are calculated as a percentage of the assets in the relevant investment options.

Service providers obviously have costs too, such as the up-front costs they incur when onboarding new customers. When providing group annuities in this context, insurers can recoup these up-front costs over the life of the annuity. But "[b]ecause annuities are structured as long-term investments, a customer who withdraws money early incurs [surrender] charges meant to compensate … up front costs." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 246 (5th Cir. 2020). Like early withdrawal penalties on bank certificates of deposit, surrender charges allow insurers to invest efficiently and protect themselves when a putatively long-term annuity turns into a short-term arrangement.

The Department of Labor has never suggested that surrender charges are problematic, much less unlawful. To the contrary, the Department has

promulgated regulations implicitly approving of the practice by requiring robust disclosure of surrender charges and other fees. *See, e.g.*, 29 C.F.R. § 404a-5. And as Plaintiffs have conceded, the surrender charges at issue in this case were conspicuously disclosed. *See* ROA.17 ¶ 14.

## II.    A Service Provider Does Not Act as a Fiduciary in Assessing a Pre-Agreed Surrender Charge.

An entity is an ERISA fiduciary only "to the extent" it does certain things, such as exercise control over plan assets. *See* 29 U.S.C. § 1002(21)(A). This "to the extent" limitation means a person can be a fiduciary for some purposes but not others. In other words, "fiduciary status under ERISA is not an all-or-nothing concept." *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) (quotation marks and citation omitted). "In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

If there is one principle under ERISA that has become absolutely clear, it is that a service provider neither acts as a fiduciary nor breaches any duty

when it charges fees that were authorized in advance by a plan fiduciary. This rule has been applied time and again to theories of fiduciary status aimed at 401(k) service providers that allegedly collected "excessive" fees, like the surrender fees here. Each time, the theories have been rejected. *See, e.g.*, *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 837–38, 40–41 (9th Cir. 2018) ("[A] plan administrator is not an ERISA fiduciary when negotiating its compensation with a prospective customer" or when withdrawing "'routine contractual fees' from ERISA plan accounts."); *McCaffree*, 811 F.3d at 1003; *Santomenno v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 293–95, 97 (3d Cir. 2014); *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009).

In addition to heeding the "to the extent" limitation in ERISA's definition of fiduciary, these rulings make economic sense. Service providers like VALIC sell services to 401(k) and other retirement plans in a highly competitive market. If their prices are too high or their services insufficient, plan fiduciaries can take their business elsewhere. *Santomenno*, 768 F.3d at 295. And it is the plan fiduciary who has a duty to ensure that the prices are reasonable. *See, e.g.*, *Davis v. Washington Univ.*, 960 F.3d 478, 483 (8th Cir.

2020) (holding that plan participant stated claim against plan fiduciary for agreeing to allegedly excessive fees).

Plaintiffs here agreed to the surrender charge they now challenge, and they did not exercise their market power by contracting with one of VALIC's many competitors rather than VALIC. Yet they now claim—in an argument that the Department of Labor conspicuously chose not to join—that even when a service provider negotiates a surrender charge at arm's length, it is somehow unlawful for the service provider to collect that charge. That contravenes the well-settled law discussed above. Extending fiduciary duties to ERISA service providers in this manner would also further compress the industry's profit margins. Fiduciary status comes with new obligations and new legal risks, both of which cost money. Over time, service providers would likely exit the marketplace and dedicate their capital to more productive uses, leaving a market with less choice, lower quality services, and—in the long term—higher fees.

Plaintiffs cannot avoid this result by pointing to VALIC's right to waive surrender charges. All of the defendants in the cases cited above (at 9–10) and in VALIC's brief (Appellees' Br. at 19–24) could have waived the charges to which they were entitled, but that did not turn them into fiduciaries. Once

again, Plaintiffs' proposed approach, if adopted, would harm retirement plans. According to Plaintiffs, VALIC is a fiduciary because its contract allowed it to waive surrender charges. If that were right, service providers would be incentivized to eliminate similar waiver provisions (and to forego any waivers of any fees) to ensure that they avoid slipping into an unexpected role as a fiduciary.

## III. A Service Provider Is Not a Party in Interest Before Contracting with a Plan Fiduciary or When Collecting the Negotiated Charge.

In its amicus brief, the Department of Labor joins Plaintiffs in urging this Court to broaden the definition of "party in interest" in a way that would invite an avalanche of ERISA class action litigation. The text of the statute cannot support this interpretation.

In addition to requiring plan fiduciaries to comply with strict standards of care, 29 U.S.C. § 1104(a), ERISA prohibits fiduciaries from entering into certain transactions "deemed likely to injure the pension plan" with "parties in interest." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000) (cleaned up); *see also* 29 U.S.C. § 1106. The prohibited transaction provision of ERISA is an "unsafe harbor"—it lists specific actions that, unless exempt, lead to liability. But it does not prohibit

*every* transaction with a plan, which is the rule Plaintiffs and the Department of Labor are urging. "Congress defined 'party in interest' to encompass those entities that a fiduciary might be included to favor at the expense of the plan's beneficiaries." *Harris*, 530 U.S. at 242. There is no reason to think this includes entities like VALIC, which Plaintiffs had no reason to favor at the expense of plan participants at the time the parties entered a contract.

Contrary to the Department of Labor's assertion (DOL Br. at 22), a contract with a service provider is not *per se* "potentially harmful to the plan." These contracts make it feasible for employers, especially small employers, to offer retirement plans. And as the Seventh Circuit recently observed, "[i]f routine payments by plan fiduciaries to third parties in exchange for plan services are prohibited, that would seem to put plan participants and beneficiaries in a worse position"—one that "in all likelihood would result in lower returns for employees and higher costs for plan administration." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 585–86 (7th Cir. 2022).

Apart from the legal flaws in Plaintiffs' and the Department of Labor's arguments, which Defendants have thoroughly explained, *see* Appellees' Br.

at 26–36, the requested rule would lead to ill-founded but hard-to-defeat class actions. The Tenth Circuit correctly found it unnecessary (and inconsistent with ERISA) to permit plan participants to "force any plan into court for doing nothing more than hiring an outside company to provide recordkeeping and administrative services." *Ramos v. Banner Health*, 1 F.4th 769, 787 (10th Cir. 2021); *see also Albert*, 47 F.4th at 585 (rejecting as "nonsensical" request to read prohibited transaction statute as forbidding "transactions for services that are essential for defined contribution plans").

Plaintiffs and the Department of Labor correctly note that ERISA permits otherwise prohibited transactions if they meet certain criteria, such as involving the payment of no more than "reasonable compensation." *See* 29 U.S.C. § 1108(b)(2). But the existence of exemptions would be cold comfort to the many defendants who would face class actions under this new theory, for a very practical reason: The exemptions are generally treated as affirmative defenses that cannot be resolved on motions to dismiss. *See, e.g.*, *Perez v. Bruister*, 823 F.3d 250 (5th Cir. 2016); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016) (collecting cases). The practical result of Plaintiffs' and the Department of Labor's proposed approach would be that not only could plaintiffs sue over literally any transaction involving a service

provider; they would also probably survive a motion to dismiss, since they would face no requirement to plausibly allege that the transactions involved unreasonable fees.

Retirement plan fiduciaries have faced their own wave of ERISA class actions in the last decade or so, with plaintiffs alleging that the fiduciaries offered imprudent investment options or agreed to pay excessive fees. Many of those cases have survived motions to dismiss based on a bare allegation that fees were too high or investment returns too low, even though imprudence is an element of the claim, not an affirmative defense. Asymmetrical discovery costs in many of these cases have led to settlements. That tide has started to turn with cases like *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022) (affirming dismissal of fee-and-expense case as implausible), and the Supreme Court's recognition that courts must defer to "the range of reasonable judgments" fiduciaries can make. *See Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022).

In contrast, plaintiffs in the new wave of class actions this case could inspire would, in theory, state a viable claim against a service provider merely by alleging that it engaged in a transaction, from buying a ream of paper to buying an annuity, without even a conclusory allegation, much less

a plausible allegation, that its compensation was unreasonable. Dismissal would be appropriate only if plaintiffs made the tactical mistake of anticipating affirmative defenses in the complaint and pleading themselves out of court. *See*, *e.g.*, *Hecker*, 556 F.3d at 588. In most cases, then, defendants would be left to wrestle with the "possibility that 'a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence.'" *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (cleaned up)). As the Supreme Court observed in a different context but in words that apply here: "The extensive discovery and the potential for uncertainty and disruption in a lawsuit could allow plaintiffs with weak claims to extort settlements from innocent companies. Adoption of [plaintiff's] approach would expose a new class of defendants to these risks." *Stoneridge Inv. Partners, LLC v. Sci.– Atlanta, Inc.*, 552 U.S. 148, 163 (2008).

# CONCLUSION

"Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Plaintiffs' and the Department of Labor have offered theories would upset reasonable and settled expectations of an entire industry and find no footing in ERISA or the case law interpreting it. They would also lead to a new and spurious wave of ERISA class actions. The Court should affirm the district court's judgment.

Dated: April 26, 2023

Respectfully submitted,

*/s/ Eric S. Mattson*
Eric S. Mattson

Eric S. Mattson
Claire G. Lee
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel.: (312) 853-7000

David Leifer
AMERICAN COUNCIL
 OF LIFE INSURERS
101 Constitution Ave. NW
Washington, D.C. 20001
Tel.: (202) 624-2311

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1.     This amicus brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,307 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This amicus brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point size and Century Schoolbook style.

Dated: April 26, 2023                        Respectfully submitted,

                                             */s/ Eric S. Mattson*
                                             Eric S. Mattson

                                             *Counsel for Amicus Curiae*
                                             *American Council of Life Insurers*

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2023, I caused the foregoing to be electronically filed with the U.S. Court of Appeals for the Fifth Circuit via the CM/ECF system, which will automatically send email notifications of the filing to all attorneys of record.

Dated: April 26, 2023

Respectfully submitted,

*/s/ Eric S. Mattson*
Eric S. Mattson

*Counsel for Amicus Curiae American Council of Life Insurers*