No. 22-20540

=========================================================

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

=========================================================

D. L. MARKHAM DDS, MSD, INCORPORATED 401(K) PLAN; D.L.
MARKHAM DDS, MSD, INCORPORATED, AS PLAN ADMINISTRATOR,
*Plaintiffs-Appellants*,

v.

VARIABLE ANNUITY LIFE INSURANCE COMPANY; VALIC FINANCIAL
ADVISORS, INCORPORATED,
*Defendants-Appellants*,

=========================================================

On Appeal from the United States District Court
for the Southern District of Texas
No. 4:22-cv-00974

=========================================================

**BRIEF FOR THE CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

=========================================================

Janet Galeria
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

Jaime A. Santos
 *Counsel of Record*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
jsantos@goodwinlaw.com

Jesse Lempel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to those already listed in the parties' briefs, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

***Amicus***:   The Chamber of Commerce of the United States of America ("Chamber") is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

***Counsel for Amicus***: Jaime A. Santos and Jesse Lempel, both of Goodwin Procter LLP. Janet Galeria and Jordan L. Von Bokern, both of the U.S. Chamber Litigation Center.

*/s/ Jaime A. Santos*
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
jsantos@goodwinlaw.com

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE*...........................................................................1

SUMMARY OF ARGUMENT ..............................................................................2

ARGUMENT ......................................................................................................4

I.    The plain meaning of the "party in interest" provision is that the service provider must have a preexisting relationship with the plan. .............7

    A.    The district court correctly held that the "natural reading" of the statutory definition supports its view. .....................................................7

    B.    The district court's reading is confirmed by the statutory context of the "party in interest" definition.........................................9

    C.    Appellants' interpretation of the statute is impermissibly circular....................................................................................................10

II.    The extreme interpretation urged by Appellants and the Secretary would undermine ERISA's objectives and deter plans and service providers from offering necessary services for ERISA plans. ......................12

    A.    Appellants' interpretation would make routine transactions targets for needless litigation that can survive a motion to dismiss. ............................................................................................14

    B.    The risk of burdensome litigation would deter employers from contracting with service providers for essential services...................16

III.    The arguments advanced by the Secretary are unpersuasive. .......................21

CONCLUSION ...................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
    47 F.4th 570 (7th Cir. 2022) ..............................................................3, 11, 13, 20

*Ali v. Barr*,
    951 F.3d 275 (5th Cir. 2020) .............................................................................12

*Allen v. GreatBanc Tr. Co.*,
    835 F.3d 670 (7th Cir. 2016) .............................................................................14

*Almendarez–Torres v. United States*,
    523 U.S. 224 (1998)............................................................................................23

*Asgrow Seed Co. v. Winterboer*,
    513 U.S. 179 (1995).............................................................................................7

*Bank of Am. Corp. v. United States*,
    2023 WL 1997806 (W.D.N.C. Feb. 14, 2023) ...................................................22

*Carr v. United States*,
    560 U.S. 438 (2010).........................................................................................7, 22

*Chavez v. Plan Benefit Servies, Inc.*,
    No. 22-50368 (5th Cir.) .......................................................................................1

*Chavez v. Plan Benefit Servs., Inc.*,
    2018 WL 6220119 (W.D. Tex. Sept. 12, 2018) .........................................3, 8, 11

*Chevron U.S.A., Inc. v. Natural Res. Def. Council*,
    467 U.S. 837 (1984)........................................................................................7, 11

*Comm'r v. Keystone Consol. Indus., Inc.*,
    508 U.S. 152 (1993)..............................................................................................4

*Conkright v. Frommert*,
    559 U.S. 506 (2010)............................................................................................13

*In re Crocker,*
    941 F.3d 206 (5th Cir. 2019) .................................................................9

*Danza v. Fid. Mgmt. Tr. Co.,*
    533 F. App'x 120 (3d Cir. 2013) ........................................................8

*Donovan v. Cunningham,*
    716 F.2d 1455 (5th Cir. 1983) ........................................................6, 14

*Easom v. US Well Servs., Inc.,*
    37 F.4th 238 (5th Cir. 2022) ...............................................................9

*Fifth Third Bancorp v. Dudenhoeffer,*
    573 U.S. 409 (2014)......................................................................15, 17

*Gonzales-Veliz v. Barr,*
    938 F.3d 219 (5th Cir. 2019) ..............................................................11

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.,*
    531 F.3d 767 (9th Cir. 2008) ..............................................................21

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995)............................................................................9

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.,*
    530 U.S. 238 (2000).................................................2, 5, 6, 10, 16, 24

*Hughes v. Nw. Univ.,*
    142 S. Ct. 737 (2022)...........................................................1, 15, 18

*Jaco v. Garland,*
    24 F.4th 395 (5th Cir. 2021) ..............................................................11

*Lauderdale v. NFP Retirement, Inc.,*
    2022 WL 17260510 (C.D. Cal. Nov. 17, 2022) .............................3, 11

*Lockheed Corp. v. Spink,*
    517 U.S. 882 (1996)............................................................................5

*Markham v. VALIC,*
    2022 WL 5213229 (S.D. Tex. Oct. 5, 2022) .......................7, 8, 10, 23

*Ortega v. United States*,
547 F. App'x 384 (5th Cir. 2013) ........................................11

*Patrico v. Voya Fin., Inc.*,
2018 WL 1319028 (S.D.N.Y. Mar. 13, 2018)................3, 11

*Peters v. Aetna Inc.*,
2 F.4th 199 (4th Cir. 2021) .............................................3, 8

*Rainwater v. United States*,
356 U.S. 590 (1958)...........................................................23

*Ramos v. Banner Health*,
1 F.4th 769 (10th Cir. 2021) ...........................3, 11, 14, 20

*Sacerdote v. N.Y. Univ.*,
2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017), *vacated on other grounds*, 9 F.4th 95 (2d Cir. 2021) .....................................14

*Santagate v. Gardner*,
293 F. Supp. 1284 (D. Mass. 1968).....................................11

*Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*,
960 F.3d 190 (5th Cir. 2020) ...............................................15

*Sellers v. Anthem Life Ins. Co.*,
316 F. Supp. 3d 25 (D.D.C. 2018).................3, 11, 13, 14, 19, 20

*Shell v. Burlington N. Santa Fe Ry. Co.*,
941 F.3d 331 (7th Cir. 2019) .................................................8

*Sweda v. Univ. of Pa.*,
923 F.3d 320 (3d Cir. 2019) ...........................................3, 15

*United States v. Williams*,
553 U.S. 285 (2008)................................................................9

*Varity Corp. v. Howe*,
516 U.S. 489 (1996)..............................................................17

*Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*,
48 F.4th 1298 (11th Cir. 2022) ..............................................8

*Yates v. United States*,
  574 U.S. 528 (2015)..................................................................9

**Statutes**

1 U.S.C. § 1 ..........................................................................21

29 U.S.C. § 1002(14)....................................................10, 23

29 U.S.C. § 1002(14)(B).....................................................3, 5

29 U.S.C. § 1104(a)...........................................................6, 16

29 U.S.C. § 1105(b)(2)..........................................................24

29 U.S.C. § 1105(c)(2)..........................................................24

29 U.S.C. § 1106..................................................................5, 6

29 U.S.C. § 1106(a)..........................................................5, 7, 23

29 U.S.C. § 1106(a)(1)...........................2, 4, 5, 14, 15, 23

29 U.S.C. § 1106(a)(1)(C).........................................................5

29 U.S.C. § 1108...........................................................5, 14, 15

29 U.S.C. § 1108(b)(2)(A).........................................................5

29 U.S.C. § 1108(b)(2)(B).......................................................22

29 U.S.C. § 1109..................................................................6, 16

34 U.S.C. § 12421(3) .............................................................21

**Other Authorities**

Deloitte, *2019 Defined Contribution Benchmarking Survey Report*,
  https://bit.ly/41xQuYG ......................................................18

*The Economics of Providing 401(k) Plans: Services, Fees, and
  Expenses, 2018*, 25 ICI Research Perspective, no. 4 (July 2019),
  https://www.ici.org/doc-server/pdf%3Aper25-04.pdf........................17

*Employees Want More Financial Wellness Benefits at Work, Survey Finds*, CPA Practice Advisor (Nov. 15, 2022), https://bit.ly/3H4KzCb ........................................................................... 19

Sharon Epperson & Stephanie Dhue, *Employers offer financial education benefits to help workers handle money concerns beyond retirement planning*, CNBC (Apr. 3, 2023), https://cnb.cx/3UXay3X ........................................................................ 19

ERISA in the United States Code, https://benefitslink.com/erisa/crossreference.html ............................................. 2

Fed. R. App. P. 29(a)(2) ............................................................................... 1

Jill E. Fisch, Annamaria Lusardi & Andrea Hasler, *Defined Contribution Plans and the Challenge of Financial Illiteracy*, 105 Cornell L. Rev. 741 (2020) ................................................................... 18

Bryan A. Garner, Garner's Modern English Usage (4th ed. 2016) ........................ 22

Tom Gresham, *Employees expect retirement benefits and education (even from small businesses)*, Benefits Pro (Feb. 15, 2023), https://bit.ly/3H41ggS ........................................................................... 19

S. Rep. No. 93-383 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4889 ....................... 18

U.S. Dep't of Labor, *Tips for Selecting and Monitoring Service Proivders for Your Employee Benefit Plan*, https://bit.ly/3oDuI7i ................... 18

Vestwell, *2023 Retirement Trends Report*, https://bit.ly/3UXk7Qq ...................... 19

## INTEREST OF *AMICUS CURIAE*

The Chamber of Commerce of the United States of America is the world's largest business federation.[1]  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  Many of its members maintain, administer, or provide services to employee-benefit plans governed by ERISA.

An important function of the Chamber is to represent its members' interests in matters before the courts, Congress, and the Executive Branch.  To that end, the Chamber regularly participates as *amicus curiae* in this Court and in others on issues that affect plan fiduciaries or service providers.  *See, e.g.*, *Hughes v. Nw. Univ.*, 142 S. Ct. 737 (2022); *Chavez v. Plan Benefit Servies, Inc.*, No. 22-50368 (5th Cir.).  The Chamber files this brief specifically to address the second "Issue Presented" by Appellants—the appropriate interpretation of "party in interest"— which the Secretary of Labor filed an *amicus* brief to likewise address.

---

[1] All parties have consented to the filing of this brief.  *See* Fed. R. App. P. 29(a)(2). No counsel for a party authored this brief in whole or in part.  No party, no counsel for a party, and no person other than *Amicus*, its members, and its counsel made a monetary contribution to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

This case concerns the scope of ERISA's prohibition on transactions between the plan and a "party in interest," which the statute defines to include service providers. The interpretation advanced by Appellants, joined by the Secretary, would treat common and necessary arms'-length transactions between the plan and service providers who lack any preexisting relationship to the plan as *prima facie* unlawful. This interpretation would make non-fiduciary service providers sitting ducks for ERISA class actions despite the fact that ERISA focuses on the conduct of *fiduciaries* who exercise discretionary authority over the management of plans—it does not focus on the conduct of non-fiduciaries, who have every right to offer their products and services in a competitive marketplace for fiduciaries to accept, reject, or negotiate.

Subject to important exceptions, ERISA bars fiduciaries from causing the plan to engage in certain transactions "between the plan and a party in interest." 29 U.S.C. § 1106(a)(1).[2] The Supreme Court has explained that "Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 242 (2000). Among those entities

---

[2] For a cross-reference guide showing ERISA sections and their corresponding U.S. code provisions, see https://benefitslink.com/erisa/crossreference.html. *Amicus* uses U.S. code citations except when quoting judicial decisions using ERISA section numbers.

defined as a "party in interest … to an employee benefit plan" is "a person providing services to such plan." 29 U.S.C. § 1002(14)(B). The defendants in this case (collectively "VALIC") are companies who contracted to maintain the employee pension benefit plan at issue.

The district court correctly held that VALIC was unambiguously *not* a "party in interest" because it had no preexisting relationship with the plan. This conclusion follows from the statute's plain language and context. And at least four courts of appeals agree with this interpretation, as do several district courts in other circuits (including in this Circuit).[3]

The contrary interpretation espoused by Appellants and the Secretary is unworkable, because it would engulf both plan sponsors and third-party service providers in waves of needless litigation that will inevitably deter plans from providing necessary and desireable services to employees. Furthermore, the primary policy arguments the Secretary and Appellants advance are simply wrong. They contend that a holding in VALIC's favor would leave plan participants with no recourse if saddled with unfair service-provider contracts and—worse yet—it

---

[3] *See Albert v. Oshkosh Corp.*, 47 F.4th 570, 583-86 (7th Cir. 2022); *Peters v. Aetna Inc.*, 2 F.4th 199, 229 (4th Cir. 2021); *Ramos v. Banner Health*, 1 F.4th 769, 787-88 (10th Cir. 2021); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 337 n.12 (3d Cir. 2019); *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at *22 (C.D. Cal. Nov. 17, 2022); *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 34-38 (D.D.C. 2018); *Chavez v. Plan Benefit Servs., Inc.*, 2018 WL 6220119, at *3 (W.D. Tex. Sept. 12, 2018); *Patrico v. Voya Fin., Inc.*, 2018 WL 1319028, at *7 (S.D.N.Y. Mar. 13, 2018).

would encourage plan fiduciaries to negotiate imprudent and disloyal contract terms to avoid prohibited-transaction claims. That ignores the entire structure of ERISA, which provides the very recourse that the Secretary and Appellants suggest is missing: a lawsuit for breach of fiduciary duty against *the plan fiduciaries that negotiated the agreement.* Indeed, ERISA places fiduciaries between plan participants and the retirement-plan marketplace so that fiduciaries can exercise their independent judgment to evaluate service providers' contract terms and negotiate reasonable ones for the plan (or decline services they feel have unreasonable terms). ERISA makes those fiduciaries liable for losses if they breach their fiduciary duties by entering into contracts with service providers that are not reasonable. ERISA does not provide plan fiduciaries who wish they had negotiated a different agreement a cause of action for buyer's remorse. This Court should therefore follow the consensus of courts that have addressed this issue and affirm the district court's decision.

## ARGUMENT

Before the enactment of ERISA, "the customary arm's-length standard of conduct" governed the plan's transactions. *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993). Seeing "an open door for abuses" under this standard, Congress enacted § 1106(a)(1) "to bar categorically a transaction that was likely to injure the pension plan." *Id.* Among these prohibited transactions,

Section 406(a)(1) provides that a fiduciary "shall not cause the plan to engage in" certain transactions "between the plan and a party in interest." 29 U.S.C. § 1106(a)(1).

"Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." *Harris Tr.*, 530 U.S. at 242. In other words, "plan insiders," with whom fiduciaries may not negotiate "at arm's length." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). The statutory definition of "party in interest" includes a list of entities that are considered parties in interest, including the employer that sponsors the plan, the plan's fiduciaries, and "a person providing services to such plan." 29 U.S.C. § 1002(14)(B).

ERISA also provides a list of exemptions applicable to otherwise prohibited transactions. One of the exemptions to claims under § 1106(a)(1)(C) permits "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." *Id.* § 1108(b)(2)(A). Although § 1106 defines the "prohibited transactions" by reference to exemptions (in § 1108) that render transactions lawful if specified conditions are met—*see id.* § 1106(a) ("Except as provided in section 1108 of this title ….")—courts have deemed the exemptions to be affirmative defenses for

which the burden of proof lies with the defendant. *See Donovan v. Cunningham*, 716 F.2d 1455, 1467-1468 (5th Cir. 1983).

The language of ERISA "§ 406(a) imposes a duty only on the fiduciary that causes the plan to engage in the transaction." *Harris Tr.*, 530 U.S. at 245; *see* 29 U.S.C. § 1106 ("A fiduciary with respect to a plan shall not cause the plan to engage in …."); *cf. id.* § 1104(a) ("Fiduciary Duties" provision prescribing how "a fiduciary shall discharge his duties with respect to a plan"). The Supreme Court has nevertheless held that although ERISA says nothing expressly about claims against non-fiduciaries, a plaintiff may sue "a nonfiduciary 'party in interest' to a transaction barred by § 406(a)" if the non-fiduciary "knowingly participates" in a fiduciary's violation of ERISA. *Harris Tr.*, 530 U.S. at 241, 248-49 (alteration omitted).

As is clear from *Harris Trust*, lawsuits against non-fiduciaries are supposed to be the exception, not the rule because *fiduciaries* are responsible for ensuring that the plan does not engage in prohibited transactions, and *fiduciaries* can be liable for a variety of relief if they violate those statutory responsibilities, *see* 29 U.S.C. § 1109. But an overly broad reading of "party in interest" has a massive potential impact on plan fiduciaries and service providers alike. It makes plan fiduciaries susceptible to a class-action lawsuit any time they engage with a completely disinterested service provider at arm's length to obtain needed services

for the plan—not remotely the type of arrangements Congress was targeting in

§ 1106(a). And for service providers, it makes them sitting ducks for a strike suit

any time they enter into a contract. That is an untenable situation.

**I.     The plain meaning of the "party in interest" provision is that the service provider must have a preexisting relationship with the plan.**

The district court correctly held that the term "party in interest," as defined

by ERISA, unambiguously excludes service providers who lack a preexisting

relationship with the plan. *Markham v. VALIC*, 2022 WL 5213229, at *9 (S.D.

Tex. Oct. 5, 2022). This conclusion follows from a straightforward application of

the "traditional tools of statutory construction." *Chevron U.S.A., Inc. v. Natural*

*Res. Def. Council*, 467 U.S. 837, 843 n.9 (1984). Three tools of statutory

construction are particularly revealing here: (A) the natural meaning of the

statute's definition of "party in interest"; (B) the statutory context; and (C) the rule

against construing a statute to rely on circular reasoning.

**A.     The district court correctly held that the "natural reading" of the statutory definition supports its view.**

"When terms used in a statute are undefined, [courts] give them their

ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995).

And, "[c]onsistent with normal usage, [courts] have frequently looked to Congress'

choice of verb tense to ascertain a statute's temporal reach." *Carr v. United States*,

560 U.S. 438, 448 (2010).

The district court properly concluded that "[t]he natural reading of the phrase 'a person providing services to such plan' is that the person has started providing services or has at least agreed to do so." *Markham*, 2022 WL 5213229, at *9. The court based this conclusion on the present-tense term "providing," combined with the qualifying language of "to such plan"—observing that "[o]ne would not normally describe someone as 'a person providing services to [a specific entity]' when the provider has not yet begun or at least reached an agreement with the entity to provide the services." *Id.* at *6-7 (alteration in original). This reading is consistent with the ordinary usage of a present-participle like "providing." *See, e.g.*, *Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 336 (7th Cir. 2019) (a "present participle" connotes "presently and continuously," and "does not include something in the past that has ended *or something yet to come*" (emphasis added)); *Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1307 (11th Cir. 2022) (similar).

Numerous courts—including the Third and Fourth Circuits—have similarly interpreted the plain language of the statutory definition. *See, e.g.*, *Peters v. Aetna Inc.*, 2 F.4th 199, 240 (4th Cir. 2021) (explaining that third party service provider "was not 'providing services' … when the [initial agreement] was signed, so that transaction did not fall within a prohibited category" (quoting *Danza v. Fid. Mgmt. Tr. Co.*, 533 F. App'x 120, 125 (3d Cir. 2013)); *Chavez v. Plan Benefit Servs., Inc.*,

2018 WL 6220119, at *3 (W.D. Tex. Sept. 12, 2018) ("Defendants were not parties in interest when they initially contracted to provide services because, at that time, they were not yet 'providing services to [such] plan.'"). This Court should reach the same conclusion.

### B.   The district court's reading is confirmed by the statutory context of the "party in interest" definition.

The Supreme Court has repeatedly relied on the "commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *see Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("a word is known by the company it keeps"). "Courts rely on the canon of *noscitur a sociis* to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 244 (5th Cir. 2022) (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality op.)). "The 'common quality' in a list that is the focus of the *noscitur a sociis* inquiry 'should be its most general quality—the least common denominator, so to speak—relevant to the context.'" *In re Crocker*, 941 F.3d 206, 219 (5th Cir. 2019) (citation omitted).

The district court correctly employed this commonsense canon, observing that ERISA's "party in interest" definition lists several entities—*e.g.*, a "fiduciary,"

"an employer," "an employee organization," "an owner," "a relative," etc.—for which "[t]he common theme appears to be that these are insider groups that could improperly influence the fiduciary's decisions about how to invest plan assets." *Markham*, 2022 WL 5213229, at *7 (citing 29 U.S.C. § 1002(14)). Indeed, the Supreme Court has expressly identified this common theme. *See Harris Tr.*, 530 U.S. at 242 ("Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries.");

This quality common to the various entities defined as a "party in interest"— the propensity to lead to favoritism by the fiduciary—applies to a service provider only when it has a preexisting relationship with the plan. As the district court explained, a "service provider that lacks a preexisting relationship with the plan does not pose this same 'insider' risk." *Markham*, 2022 WL 5213229, at *7. Thus, the canon of *noscitur a sociis* strongly counsels against broadening the definition of "party in interest" to encompass a service provider without any preexisting relationship with the plan, which would "stand in stark contrast to the rest of the party-in-interest definition." *Id.* at *9.

## C.    Appellants' interpretation of the statute is impermissibly circular.

The interpretation urged by Appellants and the Secretary suffers from another fatal flaw, as numerous courts have pointed out: "such a reading would be 'circular reasoning: the transactions were prohibited because [the service provider]

was a party in interest, and [the service provider] was a party in interest because it engaged in a prohibited transaction.'" *Ramos v. Banner Health*, 1 F.4th 769, 787 (10th Cir. 2021) (alterations in original) (quoting *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 34 (D.D.C. 2018)); *see Albert*, 47 F.4th at 576-77, 585 (noting this "circularity problem"); *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at *22 (C.D. Cal. Nov. 17, 2022) (same)*; Chavez*, 2018 WL 6220119, at *4 (same); *Patrico v. Voya Fin., Inc.*, 2018 WL 1319028, at *7 (S.D.N.Y. Mar. 13, 2018) (same).

This Court should not construe "party in interest" so that it is "defined in a circular manner." *Gonzales-Veliz v. Barr*, 938 F.3d 219, 232 (5th Cir. 2019). Indeed, this Court has recognized that "[a]n interpretation that renders circular a statute's reasoning is unreasonable and therefore unworthy of deference under *Chevron*." *Jaco v. Garland*, 24 F.4th 395, 405 (5th Cir. 2021) (discussing, in the context of the asylum statute, "the inherent circularity involved in defining a [persecuted] particular social group by reference to the very persecution from which it flees"). That is why courts resist circular interpretations where possible. *See, e.g.*, *Ortega v. United States*, 547 F. App'x 384, 387 (5th Cir. 2013) ("to define a tortious injury by the unlawfulness of the tortious act causing the injury is circular"); *Santagate v. Gardner*, 293 F. Supp. 1284, 1289 n.3 (D. Mass. 1968) (construing provisions of the Social Security Act to avoid a "problem

of circularity"); *cf. Ali v. Barr*, 951 F.3d 275, 280 (5th Cir. 2020) ("When we read Congress's statutes, 'it is our role to make sense rather than nonsense out of the *corpus juris.*'" (citation omitted)).  And here, the statutory text does not compel the circular definition that Appellants and the Secretary offer—this Court can simply give meaning to the key "providing services to such plan" language that Congress chose to include.

Appellants misunderstand this problem.  They argue (at 39) that prohibiting a transaction with a "party in interest" that is so defined on the basis of that same transaction is not circular because it is akin to an employment contract or rental agreement—which confers a status on the parties and simultaneously subjects them to a particular set of regulations.  But Appellants fail to appreciate that the circularity problem arises here because, under the statute's terms, the relevant simultaneously occurring events must somehow *cause* one another.  On Appellants' view, the transaction causes the service provider to become a "party in interest," which in turn causes that same transaction to be prohibited as a transaction "with a party in interest."  That is a fatal circularity problem.

## II.    The extreme interpretation urged by Appellants and the Secretary would undermine ERISA's objectives and deter plans and service providers from offering necessary services for ERISA plans.

Not only is the approach adopted by the court below (and many other courts) clearly supported by the text, but the competing interpretation urged by Appellants

and the Secretary is unworkable and would upset the "careful balancing" required by ERISA to "encourage[]" employers to create employee benefit plans. *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (citation omitted). As multiple courts have recognized, Appellants' interpretation would "make little sense." *Sellers*, 316 F. Supp. 3d at 36; *see also Albert*, 47 F.4th at 585 (similar).

Treating routine, arms'-length transactions with service providers who have no existing relationship to a plan as *prima facie* unlawful would expose both fiduciaries and service providers to a torrent of litigation—prohibited-transaction claims that, in many instances, are extraordinarily difficult to dismiss at the pleading stage despite the existence of myriad statutory and regulatory exemptions permitting transactions between plans and third parties. In fact, on this view, it could be *easier* to state a claim against a non-fiduciary service provider than to state a claim for breach of fiduciary duty against a named plan fiduciary—which in effect turns ERISA's heightened fiduciary standards on their head. This interpretation would inevitably increase litigation risks for plan fiduciaries and service providers alike, thereby discouraging the very types of arms'-length contracts that are beneficial for plan participants. It would also raise costs for service providers—costs that would ultimately be borne by plan participants. Nothing in ERISA requires that extreme result.

**A.    Appellants' interpretation would make routine transactions targets for needless litigation that can survive a motion to dismiss.**

The impact of a broad construction of "party in interest" is particularly concerning given ERISA's prohibited-transaction provisions.  This Court and others have held that once a plaintiff makes a *prima facie* showing of a transaction listed in ERISA § 1106(a)(1), any § 1108 exception is an affirmative defense for which the burden of proof shifts to the defendant.  *See  Donovan v. Cunningham*, 716 F.2d 1455, 1467-68 (5th Cir. 1983); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016) (collecting cases of other circuits holding the same).

This procedural fact explains why the interpretation the Appellants and Secretary advance is a trojan horse.  If a simple routine transaction between the plan and an unaffiliated service provider is all that a plaintiff must allege to make out a *prima facie* case of a prohibited transaction, then both plans and service providers may be "unable to ward off such lawsuits until after costly discovery, at the earliest." *Sellers*, 316 F. Supp. 3d at 36; *Ramos*, 1 F.4th at 787 (under Appellants' reading, "a plan participant could force any plan into court for doing nothing more than hiring an outside company to provide recordkeeping and administrative services"); *Sacerdote v. N.Y. Univ.*, 2017 WL 3701482, at *13 (S.D.N.Y. Aug. 25, 2017) ("such an interpretation would mean plan beneficiaries and participants can make out a *prima facie* case for prohibited transactions every time a recordkeeper is compensated for its services—which the plan fiduciary

14

would then have to contest in court by affirmatively pleading and proving, under ERISA § 408, that the fee payments and revenue sharing payments were 'no more than reasonable compensation.'"), *vacated on other grounds*, 9 F.4th 95 (2d Cir. 2021); *Sweda*, 923 F.3d at 336 ("it is improbable that § 1106(a)(1) … would prohibit ubiquitous service transactions and require a fiduciary to plead reasonableness as an affirmative defense under § 1108 to avoid suit"). Given this procedural framework as courts have interpreted it, the appliable statutory exemptions arrive too late in the game to afford meaningful protection against "meritless, economically burdensome lawsuits." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424-25 (2014).

If Appellants' and the Secretary's interpretation were correct, it would be *easier* to sue a non-fiduciary service provider for simply engaging in an arms'-length transaction with an ERISA plan than to sue a plan fiduciary for breaching its fiduciary duties. That is because the Supreme Court has explained that meritless claims for breach of fiduciary duty must be screened out at the motion to dismiss stage "through careful, context-sensitive scrutiny of a complaint's allegations." *Id.* at 425; *see Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) ("[T]he circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."); *Schweitzer v. Inv. Comm. of the Phillips 66 Sav.*

*Plan*, 960 F.3d 190, 200 (5th Cir. 2020) (affirming dismissal of breach of fiduciary duty claims).  But under the approach urged by Appellants and the Secretary, *every* routine transaction with a third-party service provider would be deemed a *prima facie* prohibited transaction, and parties may have to proceed to discovery for the service provider to prove the reasonableness of its compensation as an affirmative defense.

A non-fiduciary service provider could thus more readily be dragged into litigation than a breaching fiduciary could be.  And that would be so even though non-fiduciary knowing-participation claims are essentially a judicial creation from *Harris Trust* whereas claims against fiduciaries are an express creature of ERISA itself (29 U.S.C. § 1109), as are the duties and obligations that ERISA imposes *on fiduciaries alone* in § 1104(a).  That tortured interpretation cannot be right.[4]

### B.    The risk of burdensome litigation would deter employers from contracting with service providers for essential services.

The Supreme Court has expressly recognized that, in interpreting ERISA's provisions, courts should "take account" of Congress's "desire not to create a system" in which "litigation expenses" and other costs would "unduly discourage

---

[4] Given this context, if this Court ultimately agrees with the definition offered by the Secretary and Appellants, it should at the very least clarify that ERISA plaintiffs asserting prohibited-transaction claims based on a non-fiduciary's party-in-interest status must plausibly allege a prohibited transaction that is not covered by a relevant exemption.  Simply asserting an arms'-length transaction should not be sufficient to open the door to discovery.

employers from offering welfare benefit plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996); *see also Fifth Third Bancorp*, 573 U.S. at 424-25 (recognizing the "important task" of shielding fiduciaries from "meritless, economically burdensome lawsuits").

That is precisely what Appellants' rule would achieve—and not only for fiduciaries, but also for third-party service providers. Service providers are an essential part of efficiently operating retirement plans. The meritless litigation that Appellants' interpretation would enable would severely impact the kind and quality of services available for the plans and their participants.

Fiduciary duties are comprehensive, and third-party service providers have become indispensable—as well as frequently the most cost-effective option. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2018*, 25 ICI Research Perspective, no. 4, at 3 (July 2019), https://www.ici.org/doc-server/pdf%3Aper25-04.pdf ("The plan fiduciaries must arrange for the provision of the many services required to create and maintain a 401(k) plan."); *id.* at 4-7 (describing kinds of services and fee arrangements provided to 401(k) plans). Given the increasing size and complexity of retirement plans and participant populations, plan sponsors and fiduciaries heavily rely on third parties to provide a wide array of services, including "legal, accounting, trustee/custodial, recordkeeping, investment management, [and] investment education or advice"

services. U.S. Dep't of Labor, *Tips for Selecting and Monitoring Service Proivders for Your Employee Benefit Plan*, https://bit.ly/3oDuI7i ("Many businesses rely on other professionals to advise them and assist them with their employee benefit plan duties."); *see* S. Rep. No. 93-383, at 103 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4889, 4986 ("It is intended that 'benefit plan services' include investment advisory, actuarial, legal, accounting, computer and bookkeeping, and other similar services necessary for plan operations."). Indeed, without service providers, plan sponsors simply would not be able to effectively maintain retirement plans—something that is, again, an entirely voluntary decision.

Even aside from core recordkeeping services, which help "track the balances of individual accounts, provide regular account statements, and offer informational and accessibility services to participants," *Hughes*, 142 S. Ct. at 740, plan sponsors and fiduciaries also rely on outside service providers to provide other services that employees want. One important example is financial counseling and education services. *See generally* Jill E. Fisch, Annamaria Lusardi & Andrea Hasler, *Defined Contribution Plans and the Challenge of Financial Illiteracy*, 105 Cornell L. Rev. 741 (2020) (discussing research and recommending that employers provide financial counseling services through retirement plans). A Deloitte survey found that 76% of plans offer "individual financial counseling/investment advice," and that number "is expected to rise." Deloitte, *2019 Defined Contribution*

*Benchmarking Survey Report*, at 18, App'x at 29, https://bit.ly/41xQuYG. Industry surveys have found very high demand among employees for such financial counseling and education services as part of their plan services. *See, e.g.*, Vestwell, *2023 Retirement Trends Report*, https://bit.ly/3UXk7Qq ("The vast majority of employees surveyed believe companies that offer a retirement plan should also provide education about it.").[5] To provide employees with these important services, plan sponsors or fiduciaries typically contract with outside service providers.

Appellants' rule effectively draws a massive litigation target on the backs of plan sponsors, fiduciaries, and third-party service providers. This rule would likely have a dramatic adverse effect on the content, cost, and quality of services offered in employee benefit plans. It would effectively encourage fiduciaries to contract only for bare-bones services, unadorned by the enhanced services that participants increasingly expect and desire.

Inevitably, such a regime "would serve only to narrow the pool of available service providers, ultimately to the detriment of ERISA plans." *Sellers*, 316 F.

---

[5] *See also* Sharon Epperson & Stephanie Dhue, *Employers offer financial education benefits to help workers handle money concerns beyond retirement planning*, CNBC (Apr. 3, 2023), https://cnb.cx/3UXay3X; Tom Gresham, *Employees expect retirement benefits and education (even from small businesses)*, Benefits Pro (Feb. 15, 2023), https://bit.ly/3H41ggS; *Employees Want More Financial Wellness Benefits at Work, Survey Finds*, CPA Practice Advisor (Nov. 15, 2022), https://bit.ly/3H4KzCb.

Supp. 3d at 36.  This approach would "put plan participants and beneficiaries in a worse position." *Albert*, 47 F.4th at 585-586.   Plan fiduciaries would be discouraged from "outsourc[ing] tasks like recordkeeping, investment management, or investment advising, which in all likelihood would result in lower returns for employees and higher costs for plan administration." *Id.*  Indeed, such a rule may even "discourage employers from offering ERISA plans altogether" because the complexity of the modern retirement plan requires outsourcing to service providers with unique skills, such as tracking contributions, investments, distributions, loans, orders related to changes in marital status, and more. *Ramos*, 1 F.4th at 786 (quotation marks and citation omitted); *see also Sellers*, 316 F. Supp. 3d at 36.

Deterring fiduciaries from contracting with service providers is likely to have an especially pronounced impact on the ability of plans to flexibly adapt to the employees' particular needs.  Employees increasingly want an expanded menu of services—*e.g.*, financial wellness services—and employers should be able to respond to those demands by contracting with service providers as the need arises. Appellants' rule would have the unwelcome effect of deterring plan sponsors from expanding the services offered under their plans, because doing so could expose them to a strike suit.  That result causes harm all around—employees lose out on desirable services, the employers become less attractive places to work, and third-

party service providers suffer lost clients and are discouraged from innovating new service offerings.

## III.    The arguments advanced by the Secretary are unpersuasive.

The Secretary offers several textual and policy arguments against the district court's approach.  None is convincing.

A.  The Secretary (at 5) relies heavily on the Dictionary Act, which provides that "unless the context indicates otherwise ... words used in the present tense include the future as well as the present."  1 U.S.C. § 1.  But, for all the reasons given above, the context here clearly indicates that a service provider without a preexisting relationship with the plan does not fall within the "party in interest" definition.  *See supra*, pp. 7-12; *Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 775 (9th Cir. 2008) ("[T]he Supreme Court has not once invoked the Dictionary Act in an effort to convert an unambiguous verb tense into claimed ambiguity, let alone then going on to employ that manufactured ambiguity as a stepping stone to altering the plain sense of a statute.").  The Dictionary Act is therefore no help here.

The Secretary also argues (at 10-11) that the phrase "to such plan" in the statutory definition of "party in interest" does not suggest a preexisting relationship because the Violence Against Women Act refers to funding grant "proposals providing services to culturally specific and underserved populations."  34 U.S.C.

§ 12421(3).  However, since the grant "proposals" do not themselves provide any services (the organizations that submit those proposals do), that statute is best read as simply omitting the implied word "for" after "proposals."  Thus, the phrase refers to grant proposals *for* providing particular services.  *See, e.g.*, *Bank of Am. Corp. v. United States*, 2023 WL 1997806, at *4 (W.D.N.C. Feb. 14, 2023) ("In an elliptical clause, 'some of the words have been omitted as being understood.'" (quoting Bryan A. Garner, Garner's Modern English Usage 995 (4th ed. 2016))). At minimum, the use of "proposals" immediately preceding "providing services" makes abundantly clear that *in the VAWA context specifically*, Congress was referring to the *future* provision of services. That statute does not, however, change the ordinary meaning of the term or inform the meaning of the "party in interest" definition, which lacks the forward-looking context of the antecedent subject "proposals."  At any rate, a solitary and oddly-worded example is hardly evidence of the phrase's "normal usage." *Carr*, 560 U.S. at 448.

Appellants and the Secretary both place great weight on the amendments in the Consolidated Appropriations Act of 2021, codified at 29 U.S.C. § 1108(b)(2)(B).  But the provisions at issue in this case were *not* amended, and the amendment of a later Congress sheds no light on the meaning of separate statutory provisions enacted decades earlier by a different Congress.  Under basic rules of statutory interpretation, "later enacted laws ... do not declare the meaning of earlier

law." *Almendarez–Torres v. United States*, 523 U.S. 224, 237 (1998); *id.* at 269-70 (Scalia, J., dissenting) ("This later amendment can of course not cause [the statute] to have meant … something different from what it then said."); *Rainwater v. United States*, 356 U.S. 590, 593 (1958) ("At most, the 1918 amendment is merely an expression of how the 1918 Congress interpreted a statute passed by another Congress more than a half century before.  Under these circumstances such interpretation has very little, if any, significance.").  The 2021 amendments are thus irrelevant.

At bottom, as the district court observed, the narrow 2021 amendments "would be a remarkably subtle and indirect way of expanding the reach of § 1106(a)'s prohibition to all service contracts"—after all, had Congress wished to adopt the Secretary's interpretation, it "could accomplish that with a minor change to the § 1002(14) party-in-interest definition." *Markham*, 2022 WL 5213229, at *8.  But Congress left § 1002(14) and § 1106(a)(1) untouched—even after numerous decisions from federal appellate and trial courts rejecting Appellants' and the Secretary's interpretation of "party in interest."

B.    The Secretary's policy arguments are likewise unconvincing.  The Secretary first proposes (at 19-22) an elaborate analogy between ERISA's treatment of service contracts as prohibited transactions and the "old nondelegation rule" in the common law of trusts.  This analogy is fundamentally misguided.  The

reason Congress prohibited transactions with a "party in interest" has nothing to do with a "wariness" of delegation or "outsourcing" per se, *i.e.*, some notion that the trustee should ideally be a jack-of-all-trades, full-service fiduciary who performs all tasks by himself or herself. Secretary Br. 19, 22. Rather, as the Supreme Court has explained, this prohibition has everything to do with the specific identity of the parties in interest: "Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." *Harris Tr.*, 530 U.S. at 242. The Secretary never grapples with the actual rationale underpinning the "party in interest" provisions, and thus resorts to a fictional one. That is because, under the true rationale, it makes no sense to treat a totally unrelated third-party service provider as a "party in interest."[6] The Secretary does not attempt to argue otherwise.

Moreover, the Secretary's discussion (at 19-20) of delegation under 29 U.S.C. § 1105(c)(2)[7] actually *undermines* her argument. That provision discusses delegation of *fiduciary* responsibility to another—if one has been delegated *fiduciary* responsibility, then he can also be held liable as a *fiduciary* for any *fiduciary* breaches. The provision has nothing to do with hiring non-fiduciary service providers, which is not a *delegation* of fiduciary responsibility but the

---

[6] The Secretary's argument (at 22-23) regarding vendors also falls flat. That Congress may have distinguished between vendors and service providers says nothing about *which* service providers it sought to include within the prohibition.

[7] The Secretary cited 29 U.S.C. § 1105(b)(2), but that appears to be a typo.

*exercise* of fiduciary responsibility. And to the extent Congress was concerned about the ills that could result from fiduciaries' use of service providers, it included an antidote in ERISA itself: ERISA's fiduciary-breach provisions, which make plan fiduciaries liable for striking inappropriate arrangements between the plan and service providers. There is simply no need to adopt a contorted reading of "party in interest" to indirectly address a perceived problem that ERISA itself confronts directly.

The Secretary also contends (at 24) that the district court's interpretation "would create incentives for plan fiduciaries to behave in ways that are inimical to the plan's interests and contrary to ERISA's purposes," such as agreeing to a contract of indefinite length or abruptly ending and shortly thereafter resuming a contractual relationship with a provider. That concern is baseless and irrational. There is simply no reason to suspect that a fiduciary would act against the plan's interests for the sole purpose of preemptively cutting off the possibility of a *meritless* prohibited-transaction claim, and thereby open herself up to a clearly *meritorious* fiduciary-breach claim.

Nor can the Secretary point to any evidence of this irrational behavior occurring throughout the various circuits that have adopted the district court's approach. And for good reason: service-provider arrangements are incredibly complicated, and they often take many months to negotiate, obtain the requisite

plan-sponsor or fiduciary approval, and effectuate, frequently in conjunction with independent consultants and advice from counsel. Plans and service providers do not hop into and out of contractual arrangements the way people download and delete apps on their smartphones; to the contrary, the legwork required is more akin to refinancing one's home mortgage loan. But even if this concern were a realistic possibility, there is once again a clear remedy—a claim for breach of fiduciary duty.

## CONCLUSION

This Court should affirm the district court's well-reasoned conclusion that a service provider lacking any preexisting relationship with the plan is not a "party in interest" within the meaning of ERISA's prohibited transactions provision.

Dated: April 26, 2023

Respectfully submitted,

*/s/ Jaime A. Santos*

Janet Galeria
Jordan L. Von Bokern
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

Jaime A. Santos
   *Counsel of Record*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
jsantos@goodwinlaw.com

Jesse Lempel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,057 words, not including the items excluded by Federal Rule of Appellate Procedure 32(f), according to the count of Microsoft Word.  I further certify that this brief complies with typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in Microsoft Word using 14-point Times New Roman font.

Dated: April 26, 2023                                */s/ Jaime A. Santos*
                                               Jaime A. Santos

## <u>CERTIFICATE OF SERVICE</u>

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jaime A. Santos*
Jaime A. Santos

Dated: April 26, 2023